defendants on Watkins's claim for intentional infliction of emotional distress, albeit for reasons other than those stated by the majority and by the district court.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0244P (6th Cir.)
File Name:  00a0244p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ANDRE WATKINS,
        *Plaintiff-Appellant,*

        *v.*

CITY OF SOUTHFIELD, MARK WOOD, L. PORTER, and JANE DOE,

        *Defendants-Appellees.*

No. 98-2336

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 97-74716—Paul D. Borman, District Judge.

Submitted:  March 8, 2000

Decided and Filed:  July 21, 2000

Before:  WELLFORD, SILER, and GILMAN, Circuit Judges.

---

**COUNSEL**

**ON BRIEF:**   Ernest L. Jarrett, Detroit, Michigan, for Appellant.  Joseph Nimako, CUMMINGS, McCLOREY, DAVIS & ACHO, Livonia, Michigan, for Appellee.

WELLFORD, J., delivered the opinion of the court, in which SILER, J., joined. GILMAN, J. (pp. 14-20), delivered a separate concurring opinion.

_____

## OPINION
_____

HARRY W. WELLFORD, Circuit Judge. Andre Watkins appeals the district court's decision to grant summary judgment in favor of the defendants in this suit arising out of a stop of Watkins' car. He alleges that Lawrence Porter and Mark Wood, both officers of the Southfield (Michigan) Police Department, violated his constitutional rights when, without a reasonable basis for doing so, they forcibly stopped Watkins' car, pulled him out at gunpoint, handcuffed him, pushed him into the back seat of their patrol car, questioned him, and eventually released him with a ticket for disobeying a police officer's signal to stop.

Watkins filed suit against Porter, Wood, another unidentified officer, and the City of Southfield, alleging a deprivation of his constitutional rights under 42 U.S.C. § 1983 and the intentional infliction of emotional distress under state law. The district court ruled that the defendants were entitled to summary judgment on both claims. For the reasons below, we **AFFIRM** the district court.

### I. *BACKGROUND*

At the time of the incident in question, Watkins was a seventeen-year-old high school senior. His friend and passenger, Jermaine Gabriel, was a few years older. Somewhere between four and five o'clock in the early morning of July 5, 1995, Watkins was driving Gabriel home after an evening spent at Watkins' home. A marked Southfield Police Department patrol car, operated by defendants Porter and Wood, passed Watkins traveling in the opposite direction, and the officers then began to follow Watkins. They did not, however, immediately signal for

degree of transient and trivial emotional distress is a part of the price of living among people. *The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it.* The intensity and the duration of the distress are factors to be considered in determining its severity."

*Pratt v. Brown Mach. Co.*, 855 F.2d 1225, 1240 (6th Cir. 1988) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. j) (emphasis added).

Here, although Watkins stated in his deposition that at certain times he was "scared," "frightened," and "surprised," he has failed to set forth any evidence that he has suffered a level of distress that is "so severe that no reasonable man could be expected to endure it." *Pratt*, 855 F.2d at 1240; *see also Bonelli*, 421 N.W.2d at 229 (holding that the plaintiff's alleged harm "fell far short" of that required to establish severe emotional distress where he "made no mention of severe depression, substantial psychological trauma, or even minor physical consequences," even though he testified that he was "shocked . . . surprised, and upset" as a result of the defendant's conduct); *Roberts*, 374 N.W.2d at 912 (holding that the plaintiffs' testimony to the effect that they felt disappointed, mad, and upset "d[id] not even approach the level of emotional distress contemplated by the Restatement drafters"); *cf. Haverbush v. Powelson*, 551 N.W.2d 206, 209 (Mich. Ct. App. 1996) (holding that the element of severe emotional distress was satisfied when the plaintiff, a doctor, testified that (1) he was especially fearful after the defendant left an ax and a hatchet on his vehicles, (2) the defendant's letters accusing him of harassment caused him great concern that the defendant was going to interfere with his wedding, (3) he was worried about his reputation because of what the defendant had said about him to others, (4) he was concerned with his patients' safety, and (5) the defendant's actions affected the way he worked).

I therefore agree with the majority that the district court properly granted summary judgment in favor of the

burglaries, the defendant pulled his car into a lounge's parking lot and, without slowing down or speeding up, returned to the public roads). The added factor in the case before us, however, is Watkins's failure to stop when the police signaled for him to do so. For the reasons stated by the majority, this provided the police with justification to make a forced stop. I therefore concur in the court's judgment on this issue.

## B.   The intentional infliction of emotional distress claim

The majority has also held that the officers' conduct was not, as a matter of law, "extreme and outrageous," and therefore the district court did not err when it granted summary judgment in favor of the defendants with respect to Watkins's common law claim for intentional infliction of emotional distress. Without either agreeing or disagreeing, I find no need to reach this issue because Watkins failed to present sufficient evidence that he has suffered severe emotional distress as a result of the defendants' alleged actions.

In *Roberts v. Auto-Owners Insurance Co.*, 374 N.W.2d 905 (Mich. 1985), the Supreme Court of Michigan noted that the two essential elements for a claim of intentional infliction of emotional distress are that the alleged conduct must be "extreme and outrageous" and that the conduct must cause the plaintiff to suffer "severe emotional distress." *See id.* at 908. Recovery is permitted "only in the most egregious of cases." *Bonelli v. Volkswagen of Am., Inc.*, 421 N.W.2d 213, 228 (Mich. Ct. App. 1988). With respect to the element of severe emotional distress, this court has written as follows:

> "Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is extreme that the liability arises. Complete emotional tranquility is seldom attainable in this world, and some

Watkins to pull over. According to Watkins, he was driving under the speed limit "at about 20 miles per hour." The district court in this case took judicial notice that the posted speed limit on the particular road being traveled was forty miles per hour. In his brief, Watkins asserts the road had no minimum speed, and the defendants have not questioned that assertion. The record does not indicate whether there was more than one lane in each direction.

Watkins turned down a street commonly referred to as 8-1/2 Mile Road, and traveled east towards Evergreen Road. Watkins claimed that once he was on 8-1/2 Mile Road, he continued to drive very cautiously and slowly. He estimated that he was traveling only fifteen miles per hour in a twenty-five mile per hour zone.[1] Watkins alleges that Porter and Wood began to drive in an intimidating matter, approaching him and following very closely. Watkins stopped at stop signs and when he "was going to make a turn."

Watkins eventually reached Evergreen Road, and turned right. Immediately after doing so, defendant Wood turned on the police car's spotlight and aimed it towards the rear windshield of Watkins' car. Watkins, however, continued to drive for another block or two, maintaining his speed of approximately fifteen miles per hour. When asked at his deposition why he continued driving, Watkins said that "[the officer driving] only had on his side lights." The officers then activated the police car's red and blue flashing lights. Watkins stated that he "slowed down and [he] signaled to the officer that [he] was going to stop at the gas station, which was only a block and a half away." The record does not indicate how or in what manner Watkins "signaled" that he

---

[1] Our assertion that the speed limit on 8-1/2 Mile Road is 25 miles per hour is taken from the district court's November 6, 1998 order and opinion partially dismissing plaintiff's complaint and granting summary judgment to the defendants. *See* Order at p.3. Though the court gave no basis for its finding in that regard, we will assume that the speed limit on 8-1/2 Mile Road is 25 miles per hour in light of the fact that Watkins has not contested the district court's finding.

was intending to stop at the nearby gas station. Although Watkins' deposition does not indicate why he sought to reach the gas station, he claims in his brief it was a well lit area because he was concerned about "the bizarre manner" in which the officers were driving. Other patrol cars arrived at the scene and Watkins was forced to stop.

The officers' affidavits included the following explanation regarding the decision to initiate the stop: "Due to [Watkins]' suspicious driving and the recent crime in the area, [we] decided to perform an investigatory stop." Porter and Wood also asserted that, despite having activated their car's red and blue lights, Watkins "failed to pull over or to slow down," and that once the car was forced to stop, Watkins acted "very suspicious and was not cooperative." The police then approached Watkins' vehicle with their guns drawn, and several officers allegedly directed racist remarks toward Watkins and Gabriel. They conceded that Watkins was "ordered out of his vehicle, handcuffed, patted down for weapons, and placed in a police vehicle for questioning." According to Watkins, the officers then "forcibly" placed him into one of the patrol cars, "ram[ming] [his] head up against the top of his car." Watkins admits that he suffered no cuts or bruises.

After being placed in the police car, the officers questioned Watkins at length, primarily asking him how he knew Gabriel and where the two were going. Watkins was eventually released after being issued a ticket for disobeying a police officer's signal. The charge was ultimately dropped.

Watkins and Gabriel subsequently filed the instant suit in the court below. The district court, by stipulation of the parties, dismissed Gabriel's claims because he could not be located. Watkins' state law causes of action for false imprisonment, false arrest, and assault and battery were later dismissed by the district court.

The defendants filed two separate motions for summary judgment, one directed at Watkins' remaining state law claims, and one aimed at his federal cause of action. The

[E]ven without the anonymous call, the trial court concluded [that] the police officers had sufficient reasonable suspicion to stop the defendant based upon the defendant's driving 25 miles per hour in a 35 miles per hour zone on a relatively straight road at 1:00 a.m.

We disagree with the court's legal conclusion . . . . [T]he purely innocuous facts mentioned by the trial court, without more, clearly are insufficient to establish reasonable suspicion to stop the defendant.

*Id.* at 891.

Like the *Stuart* court, I do not believe that driving ten miles per hour below the speed limit, even in a high-crime area at night, is sufficient in and of itself to constitute reasonable suspicion "that illicit activity might be in progress." *Spear v. Sowders*, 71 F.3d 626, 631 (6th Cir. 1995); *see also United States v. Nicholas*, 448 F.2d 622, 624-25 (8th Cir. 1971) (distinguishing *Carpenter v. Sigler*, 419 F.2d 169 (8th Cir. 1969), and holding that the stop of the defendant's out-of-state car, which occurred in an high-crime area at 11:00 p.m., was unjustified because the (1) the police were not investigating any particular crime, (2) the police had no information regarding the car or its occupants, (3) there was no showing in the record that the police had been informed of suspicious activities in the vicinity, and (4) the defendant was a black man in a predominantly black neighborhood); *People v. Burrell*, 339 N.W.2d 403, 408 (Mich. 1983) ("[A] stop cannot be justified by individualized, articulable suspicion when a police officer merely observes two black men in a dark automobile driving slowly through a white or predominantly white community and [the officer] recalls that armed robberies occurred the month before which were allegedly committed by two black males in a dark vehicle."); *City of Minot v. Johnson*, 603 N.W.2d 485, 488 (N.D. 1999) (holding that the police officer's stop of the defendant's vehicle was based on "no more than a vague hunch of illegal activity" and was therefore unlawful when, at approximately 4:00 a.m. in an area that had experienced several recent

This last case, *Stuart*, is worthy of further comment because of its discussion regarding facts that, but for the anonymous call, are very similar to our own. In *Stuart*, a late-Saturday night anonymous caller had informed the police that the caller had witnessed the defendant operating his vehicle in an erratic manner. Officers soon located the car (the witness had noted the license plate number) traveling on a straight road that had a thirty-five miles per hour speed limit. When the defendant passed the officers in the opposite direction, they executed a U-turn and began following him. After determining that the defendant's car was going approximately twenty-five miles per hour, the officers signaled the defendant to stop. One of the officers explained that he "based [the decision] upon the defendant's slow driving, the time of day, and the day of the week." *Stuart*, 452 S.E.2d at 888. The defendant was arrested and thereafter convicted of driving while intoxicated. In response to the defendant's challenge to the lawfulness of the stop, the trial court first ruled that the substance of the telephone tip could not be relied upon by the police as a factor to support making the stop because it was from an unknown and potentially unreliable caller. The trial court further concluded, however, that the stop was justified based on the fact that the defendant was driving slowly down a straight road late at night. *Id.* at 889.

The Supreme Court of Appeals of West Virginia, which is that state's highest court, affirmed. It first ruled that the trial court could in fact have taken into account that the officers had received an anonymous telephone tip. In holding that the stop was lawful, the Supreme Court of Appeals then stated that "given the totality of the circumstances, the anonymous call, and the police officers' observations once they arrived on the scene, we conclude the police officers did have sufficient reasonable suspicion to stop the defendant to make a further investigation." *Id.* at 892. Most notably, however, the court specifically rejected the notion that a driver's actions similar to those present in the case at bar could give rise to reasonable suspicion:

district court (1) dismissed with prejudice Watkins' state constitutional claims; (2) dismissed with prejudice those claims asserted against the City of Southfield; (3) granted summary judgment on the basis of qualified immunity in favor of the defendants with respect to Watkins' § 1983 cause of action; and (4) granted summary judgment in favor of the defendants with respect to Watkins' remaining state law claim of intentional infliction of emotional distress on the grounds that the officers were protected by governmental immunity and that their alleged conduct was not "extreme and outrageous."

In substance, the district court held that Watkins' driving so slowly at four o'clock in the morning in an area where there had been recent, violent, criminal activity, when considered in light of his subsequent conduct when the officers activated their flashing lights, were sufficient to arouse reasonable suspicion to provide justification for an investigatory stop. The court concluded that "[d]riving at one half the speed limit at 4:00 a.m. would provide a basis for suspecting, *inter alia*, that the driver was drunk, high on drugs, or trying so hard to provide [sic] suspicion for a police stop as to actually establish highly suspicious behavior. Second, the police were aware of an investigation [of] recent violent criminal activity in that area; there had been a shooting and several robberies within the two days." Furthermore, the district court rejected the Watkins' claim that the officers used unreasonable force in executing the stop. Finally, the district court found that the defendants were entitled to governmental immunity with respect to the intentional infliction of emotional distress claim and concluded that "[a]t four o'clock in the morning, it is not outrageous to draw a gun and handcuff a suspect who is driving strangely, and who fails to yield to police signals to pull over."

In this appeal, Watkins does not take issue with the district court's rulings dismissing his state constitutional claims, nor does he challenge the dismissal of the City of Southfield from his suit. Rather, he argues that genuine issues of material fact exist that preclude summary judgment with regard to his

§ 1983 claim and his intentional infliction of emotional distress cause of action.

## II. *ANALYSIS*

### A. Standard of Review

We review *de novo* a district court's decision to grant or deny summary judgment. *See Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997). Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The judge is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

### B. Qualified Immunity Analysis

Government officials performing discretionary functions are entitled to qualified immunity from civil suits for damages arising out of the performance of their official duties "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). "To successfully state a claim under 42 U.S.C. § 1983, a plaintiff must identify a right secured by the United States Constitution and the deprivation of that right by a person acting under color of state law." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992). "The key inquiry in analyzing a claim of qualified immunity is whether the defendant's alleged conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994).

The majority relies on eight cases to justify its conclusion, none of which I find controlling. More importantly, a close review of these decisions reveals that each is, to a greater or lesser degree, distinguishable. *See United States v. Pineiro*, No. 95-3923, 1997 WL 413656, at *3 (6th Cir. July 17, 1997) (unpublished opinion) (defendant was violating an Ohio statute by driving too slowly in the passing lane); *United States v. Ramos*, No. 93-6196, 1994 WL 560870, at *2 (6th Cir. Oct. 12, 1994) (unpublished opinion) (defendant was operating his vehicle below the minimum interstate speed limit); *United States v. Basey*, 816 F.2d 980, 984, 989 (5th Cir. 1987) (area residents had seen the defendant's car "aimlessly wandering back and forth" on little-traveled rural roads prior to the discovery of a nearby burglary, the victim saw the car close to his home shortly before he discovered the burglary, the victim took note of the car's description and license plate number, and the victim identified the car in the presence of the police officers when the car passed them after the discovery of the crime); *United States v. Rickus*, 737 F.2d 360, 362, 365 (3d Cir. 1984) (car was moving "extremely slow" past closed stores in a commercial district at 3:30 a.m., and then proceeded in an "apparently aimless course" in a residential area); *United States v. Holland*, 510 F.2d 453, 454 (9th Cir. 1975) (officers were notified of an "armed and dangerous" fugitive believed to be in the intermediate area, they noticed a vehicle traveling toward them "at five to eight miles per hour," the occupants stared at the officers for "an unusually long time" as they passed, and the vehicle eventually slowed to "walking speed"); *Carpenter v. Sigler*, 419 F.2d 169, 170-72 (8th Cir. 1969) (officers noticed that a car with out-of-county tags "moved very slowly past several closed business establishments and pursued a rather erratic course" in a town of approximately 2,000 persons where "unidentified cars do not routinely travel at that time"); *Leaper v. State*, 753 P.2d 914, 915 (Okla. Crim. App. 1988) (car was moving "extremely slow" at only five miles per hour at 3:30 a.m.); *State v. Stuart*, 452 S.E.2d 886, 887, 891-92 (W. Va. 1994) (police were alerted to the defendant's vehicle by a sufficiently-corroborated 911 call that identified the defendant as driving while intoxicated).

---

**CONCURRENCE**

---

RONALD LEE GILMAN, Circuit Judge, concurring. I agree with the majority's ultimate conclusion that the district court did not err in granting summary judgment in favor of the defendants. Because no seizure occurred until Watkins's car was forced to a stop, his admitted failure to pull over when the police signaled for him to do so was a legitimate factor for the police to consider in determining whether they had reasonable suspicion to justify making the stop. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991) (holding that a "seizure" under the Fourth Amendment "requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority") (emphasis in original); *United States v. Santamaria-Hernandez*, 968 F.2d 980, 983 (9th Cir. 1992) ("The determination [of] whether [officers] have founded suspicion to justify a stop may take into account all of the events that occur up to the time of physical apprehension of a suspect who flees."). Without this added factor, however, I would be inclined to reach a contrary conclusion in the case before us. I also write separately because I believe that, regardless of whether the officers' alleged conduct was "extreme and outrageous," Watkins failed to present sufficient evidence that he suffered "severe emotional distress."

**A.   The lawfulness of the stop**

During the course of its analysis, the majority writes that "[t]he officers may have suspected that [Watkins] was intoxicated or that he was 'casing' the area." In support of this proposition, the majority states that Watkins's car "was proceeding in the dark morning hours at half the speed limit of the streets in a residential area." I find such inferences on the facts before us too attenuated to justify a stop under *Terry v. Ohio*, 392 U.S. 1 (1968).

The plaintiff in this situation must overcome two hurdles: "First, the allegations must state a claim of the violation of clearly established law. Second, the plaintiff must present evidence sufficient to create a genuine issue as to whether the defendant in fact committed the acts that violated the law." *Id.* Whether a plaintiff has met each of these two burdens is a question of law. *See id.*

As an initial matter, we note that "both the right to be free from unreasonable seizures and to be free from the use of excessive force under the Fourth Amendment are clearly established." *Adams*, 31 F.3d at 386-87 (citations omitted). Thus, the sole qualified immunity question presented by this appeal is whether Watkins has presented evidence sufficient to create a genuine issue as to whether Porter and Wood in fact violated the law.

Assuming that the police themselves may have operated the patrol car erratically while following Watkins, the question remains whether there was basis for a reasonable suspicion and an investigatory stop under the circumstances based upon Watkins' conduct. While the case presents a close question, we are inclined to affirm, finding that there was an appropriate basis for a *Terry* stop.[2]

What occurred before the police decided to follow Watkins was the subject of differing factual contentions and accounts. We do not deem such a dispute to be one of material or genuine consequence, because at this stage in the proceedings we view the evidence in the light most favorable to Watkins. There is no substantial dispute, on the other hand, about Watkins' conduct.

Watkins, a high school student at the time, was driving in the dark of predawn, in an area of recent violent criminal activity known as such by the officers, at about half the allowable speed limit, stopping not only at stop signs but each time he made a turn. Watkins admittedly ignored the officers'

---

[2] *Terry v. Ohio*, 392 U.S. 1 (1968).

clear indications to stop for an investigation. We find that these circumstances constitute the "minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 120 S. Ct. 673, 676 (2000).

We agree with the reasoning of the Third Circuit in *United States v. Rickus*, 737 F.2d 360 (3d Cir. 1984), where that court held that the officers had the requisite reasonable suspicion to make a *Terry* stop of a vehicle that was traveling fifteen to twenty miles per hour below the applicable speed limit, at 3:30 a.m., in an area that had "recently been victimized by a spate of burglaries." The court explained that "[t]he reputation of an area for criminal activity is an articulable fact upon which a police officer may legitimately rely [in making a *Terry* stop]." *Rickus*, 737 F.2d at 365. The court also found the vehicle's inordinately slow rate of speed could have legitimately aroused suspicions of an experienced police officer. *Id.* (citing *United States v. Holland*, 510 F.2d 453, 456 (9th Cir. 1975) (holding that car making inordinately slow progress at small hours of the morning could have aroused the suspicions of a local officer who is alert to the unusual within his beat); and *Carpenter v. Sigler*, 419 F.2d 169 (8th Cir. 1969) (holding that stop of a car traveling slowly in recently burglarized area was valid)).

Under very similar circumstances, one state court (applying a "probable cause" standard) found that "appellant's driving at an extremely slow rate of speed during the early morning hours on residential streets constituted unusual or suspicious behavior which was probable sufficient cause for [the defendant officer] to stop appellant's automobile." *Leaper v. State of Oklahoma*, 753 P.2d 914, 925 (Okla. Cr. Ct. App. 1988). That court noted that a police officer "need not actually observe the violation of any law to have probable cause to stop that automobile." *Id.*; *see also West Virginia v. Stuart*, 452 S.E.2d 886 (W. Va. 1994) (officer's stop of vehicle upheld for unusual slow speed in early morning hours based upon this "detection clue" of behavior of drunk drivers).

(Mich. 1985) (internal quotes omitted). Liability will only be imposed

> "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. . . . [L]iability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."

*Id.* at 908-09 (quoting Restatement, Torts, 2d § 46, comment d). Hence, a plaintiff will only be able to recover for intentional infliction of emotional distress "in the most egregious of cases." *Bonelli v. Volkswagen of America, Inc.*, 421 N.W.2d 213, 228 (Mich. Ct. App. 1988).

Here, Watkins contends he was harassed, intimidated and verbally assaulted by defendants when they tried to "ram" him from behind and then forced him off the road. He also claims that he was physically abused when defendants pulled him from his car and put him in the back of their squad car, and a racial epithet was addressed to him. As we have noted, the stop of Watkins' vehicle was justified under the circumstances. Considering the fact that Watkins ignored the officers' command for him to stop, the force they used to effectuate the stop was necessary. Hence, those actions could not be deemed to have been so unreasonable or excessive as is required to maintain this claim of intentional infliction of emotional distress. The alleged use of a racial epithet gives us some pause, but we are satisfied that the district court did not err in granting summary judgment in favor of defendants on this claim.

For the reasons stated, we **AFFIRM** the decision of the district court.

door but it cause no cuts or bruises. Watkins was briefly questioned and then released after receiving a ticket for disobeying a police officer's signal. Watkins took Gabriel home and then went home himself.

There is no substantial evidence that defendants used unreasonable force against Watkins. "[P]olice officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Therefore, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Id.* at 396 (citation omitted). As previously indicated, Watkins was driving suspiciously in an area where several crimes had recently occurred, and defendants had to force him to the side of the road before he would stop. As defendants approached Watkins, they had no idea whether he was armed or dangerous. Furthermore, the record does not reflect that Watkins suffered any serious or permanent physical damage. The police had difficulty in getting Watkins into the back of the squad car with handcuffs on. We do not deem this force, even when viewed in a light most favorable to Watkins, to have been excessive under the circumstances. Thus, the defendants were entitled to qualified immunity in this claim as well. Accordingly, we conclude that the district court did not err in granting summary judgment in favor of the defendants on the § 1983 claim.

**D. Intentional infliction of emotional distress**

Watkins also submits the district court erred in granting summary judgment as to his claim for intentional infliction of emotional distress because he claims that defendants' conduct was extreme and outrageous. To establish a prima facie case of intentional infliction of emotional distress, a plaintiff must show "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation and (4) severe emotional distress." *Roberts v. Auto-Owners Insurance Co.*, 374 N.W.2d 905, 908

Similarly, we do not believe that the district court was in error in concluding, in effect, that an officer "in the defendant's position, measured objectively, would [not] have *clearly understood* that he was under an affirmative duty to have refrained from such conduct." *Dominque v. Telb*, 831 F.2d 673, 676 (6th Cir. 1987); *see also Pray v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir. 1995) (citing *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994)). Supreme Court precedent is consistent with our conclusion here. In *Adams v. Williams*, 407 U.S. 143 (1972), the Court emphasized the duties of a suspicious officer:

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*Adams*, 407 U.S. at 145-46 (citations omitted).

Recently, the Court upheld the stop and seizure of a pedestrian who was present in a high crime area because he fled from the police officers when he saw them. *Wardlow*, 120 S. Ct. at 675-76. The Court determined that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. . . . But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Id*. at 676 (citations omitted). The Court considered the pedestrian's flight as a pertinent factor in determining whether reasonable suspicion existed. It reasoned that "[h]eadlong flight – wherever it occurs – is the

consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."[3] *Id.*

In this case, the officers knew that the area had recently been victimized by violent crimes. Watkins' car was proceeding in the dark morning hours at half the speed limit of the streets in the residential area. The officers may have suspected that the driver of the car was intoxicated or that he was "casing" the area. *See United States v. Basey*, 816 F.2d 980, 989 n.14 (5th Cir. 1987) (noting that slow-moving cars in the early morning hours may suggest that the area is being "cased"); *see also United States v. Pineiro*, No. 95-3923, 1997 WL 413656 (6th Cir. July 17, 1997) (upholding stop of vehicle that slowed down upon seeing the officers, and slow speed was impeding traffic); *United States v. Ramos*, No. 93-6196, 1994 WL 560870 (6th Cir. Oct. 12, 1994) (upholding stop of vehicle that was traveling 40 miles per hour on interstate where minimum speed limit was 45 miles per hour and officer suspected that driver was falling asleep). In addition, the fact that Watkins refused to stop when he was directed to do so contributed to the officers' suspicion that

---

[3] In *California v. Hodari D.*, 499 U.S. 621 (1991), the Supreme Court held that when a suspect flees at the sight of an officer, a "seizure" within the meaning of the Fourth Amendment does not occur until the suspect is physically apprehended or he actually submits to the authority of the officer. *Hodari D.*, 499 U.S. at 625-26; *see also United States v. Taylor*, 956 F.2d 572, 576 n.2 (6th Cir. 1992) (citing *Hodari D.* and stating that seizure does not occur during the time leading up to physical apprehension). Therefore, any evidence discovered during the hot pursuit of the suspect could be properly admissible at trial. *See Hodari D.*, 499 U.S. at 629 (holding that no "seizure" had occurred during pursuit of defendant and, thus, the cocaine abandoned while defendant was running was not the fruit of the seizure). This rule applies not only to encounters on foot, but also to stops of automobiles. *See United States v. Washington*, 12 F.3d 1128, 1132 (D.C. Cir. 1994). The impact of *Hodari D.* is significant because "[t]he determination [of] whether [officers] have founded suspicion to justify a stop may take into account all of the events that occur up to the time of physical apprehension of a suspect who flees." *United States v. Santamaria-Hernandez*, 968 F.2d 980, 983 (9th Cir. 1992). *Wardlow* makes clear that the "events" that may be considered include flight of the suspect. *See Wardlow*, 120 S. Ct. at 676.

criminal activity may have been afoot. In light of these circumstances, we find that the officers had a reasonable suspicion to conduct a *Terry* stop of Watkins' car.[4] We deem the ignoring of orders to pull over the vehicle to be equivalent for these purposes to attempting to flee from police upon a signal to stop.

Moreover, "if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Marley v. Briggs*, 475 U.S. 335, 349 (1986). We cannot find the district court to have erred in concluding that the circumstances here indicated no knowing violation of civil or constitutional law by the defendant officers. *See id.*

**C. The district court did not err when it ruled that Porter and Wood were entitled to summary judgment as to Watkins' claim of excessive force**

We also agree with the district court's determination that the defendants are entitled to summary judgment regarding Watkins' excessive force cause of action. Even when viewed in the light most favorable to Watkins, the facts do not support this claim.

The officers got out of their vehicles and ordered Watkins to get out of the car. As he reached to undo his seatbelt, Watkins contends that the officer in front of him said, "Go ahead and do it, as if I was going for a gun." An officer reached in and undid Watkins' seatbelt and pulled him out of the car. After being handcuffed and patted-down for weapons, Watkins was placed in the back of the squad car. As he was attempting to get in the squad car with the handcuffs on, Watkins hit his head once on the frame of the

---

[4] The Court in *Wardlow* noted that "state courts have differed on whether unprovoked flight is sufficient grounds to constitute reasonable suspicion." *Wardlow*, 120 S. Ct. at 675 n.1. While we do not address that particular issue in the present case, we hold that the flight of a suspect should be considered as a factor in determining whether reasonable suspicion exists.