**Thomas L. FEATHERS,
et al., Plaintiffs,**

v.

**William AEY, et al., Defendants.**

No. 5:01–CV–2081.

United States District Court,
N.D. Ohio,
Eastern Division.

March 27, 2002.

Paul J. Pusateri, Paul R. Reiners, Howes, Daane, Milligan, Kyhos & Erwin, Canton, OH, for Plaintiffs.

Bruce H. Christensen, Jr., John C. Reece, City of Akron, Department of Law, Akron, OH, for Defendants.

### ORDER

GWIN, District Judge.

On January 23, 2001, Defendants William Aey, J.P. Donohue, and the City of Akron filed for summary judgment [Doc. 19]. Plaintiffs Thomas and Kathleen Feathers oppose the motion. Because there is an issue of material fact as to what happened on the Feathers' front porch, the Court denies the defendants' motion for summary judgment on Thomas Feathers' constitutional claim. The Court also denies Aey and Donohue qualified immunity at this stage of the proceedings.

The Court, however, finds that Kathleen Feathers shows insufficient evidence to make out a claim of constitutional deprivation and therefore grants judgment as to her claims. The Court further finds that the plaintiffs show insufficient evidence to make out their state law claims and gives judgment as to those claims. Finally, the plaintiffs show insufficient evidence to make out a claim against the City of Akron. For that reason, the Court grants judgment to the City of Akron with regard to this claim.

### I. Background

The plaintiffs claim that City of Akron Police Officers William Aey and J.P. Donohue deprived them of rights given by the U.S. Constitution when, on August 31, 2000, Officers Aey and Donohue stopped, arrested, and used force on Thomas Feathers. They make claims under 42 U.S.C. § 1983 and under various state law theories.

The events giving rise to the Feathers's claims began on August 31, 2000, when an anonymous caller reported to police that a white male with a beard shouted at him from a porch of a house on North Howard Street in North Akron. In his 911 call, the unidentified caller stated:

CALLER: Yes maam, I was just walking down North Howard Street and some guy on his porch, I don't know him, he looked at me and said Shut the fuck up and he pointed something at me.

OPERATOR: OK, how long ago?

CALLER: Just right now, I'm on the corner of North Howard and Cuyahoga Falls Avenue.

OPERATOR: And which way did he go?

CALLER: He is still on the porch. I don't know what he pointed,

I don'[t] even know this guy. He looks like his is pretty drunk though.

*    *    *    *    *    *

OPERATOR: Ok, do you wish to leave your name?

CALLER: Um, not really but you can have somebody come by here.

(Defs.' Ex. A–2).

After receiving the call, the Akron Police Department directed Akron Police Officers Orrand and Yurick to check the call. Before Orrand and Yurick could respond, Defendants Aey and Donohue went to the location, apparently because they were closer. Aey and Donohue were the first officers to arrive on the scene.

The parties' versions of what occurred at the Feathers home differ significantly. According to the defendants, they came onto the plaintiffs' porch and ordered Thomas Feathers to remove his hands from his pockets. After repeated requests, the defendants acknowledge that he removed at least one hand but claim he then returned his hand to his pockets. They also claim that Feathers headed toward the door leading to his home. The defendants acknowledge that Thomas Feathers went to the door of his house to ask his father to film the encounter with a video camera in the living room.

Officers Aey and Donohue claim they were justified to stop Thomas Feathers and pat him down. After tackling him, they say they had probable cause to arrest him when they found a work knife in one of this pockets.

The Feathers' version of the events differs significantly from the version given by Officers Aey and Donohue. At his deposition, Thomas Feathers testified:

Q. Okay. What was your reaction when you saw the police, what were you thinking?

A. I had no idea why they were there.

Q. Did the police officer get out immediately or did they sit in the cruiser for a time?

A. Immediately.

Q. Did both officers get out?

A. Yes.

Q. Were both officers in uniform?

A. Yes.

Q. What was the first thing you remember when they got out of the cruiser?

A. Officer Aey demanding us to get to the other end of the porch.

Q. And who is "us"?

A. My wife and I.

Q. Was your father outside at the time?

A. No, sir.

Q. If I'm looking at the house from the street, which side of the porch were you and your wife on to begin with, the right side or the left side?

A. The left side.

Q. If I'm looking at the house?

A. Yes.

Q. And did you understand that Officer Aey was telling you and your wife to move over to the right side of the house?

A. Yes.

Q. Do you recall the words that he used?

A. Get to the other end of the porch.

Q. And what did you do?

A. Walked toward the other end of the porch.

Q. And what happened next?

A. My wife was asking the whole time what's up, why are you here.

. . . .

A. My wife continued to ask why they were there, what we could—what's up, and he would then holler orders, take your hands out of your pockets.

Q. Did you understand he was talking to you?

A. Yes.

Q. Did you have your hands in your pockets?

A. Yes. And a second later he asked again, take you—or demanded with real abrasive take your hands out of your pockets.

Q. Did you hear him say it a second time?

A. Yes.

Q. Did you take them out of your pockets?

A. Yes, like—took my hands out and by habit just put them back in.

. . . .

Q. What happened after you put your hands back in the pocket, your pockets?

A. He screamed again take your hands out of your pockets, and I then turned and looked at my wife like, you know, this guy is not going to talk to us. I then took my hands out of my pockets as I turned, opened the door with my right hand and leaned on the door jamb with my left hand and leaned in—leaned my head in standing on one leg and told my dad come out here quick, bring the cam corder.

(Thomas Feathers Dep. at 62–66).

Consistent with her husband's testimony, Kathleen Feathers says that Officers Aey and Donohue came onto the porch shouting and demanding they move to an opposite end of the porch. Like her husband, she testifies that her husband removed his hands from his pocket prior to the police officers use of force upon him.

Thomas Feathers was arrested and taken to the Summit County Jail. Before he was transported to the jail, Thomas Feathers was searched. The police officers found a multi-purpose knife on his person.

On September 11, 2000, the Summit County Grand Jury indicted Thomas Feathers for assault against a police officer, carrying a concealed weapon and resisting arrest based on the events of August 31, 2000. On January 31, 2001, the matter was tried to a jury in Summit County Common Pleas Court. During trial, the prosecution moved to dismiss the concealed weapon and resisting arrest charges. The jury acquitted Thomas Feathers of the assault charge.

On August 30, 2001, the plaintiffs filed their complaint. In Count 1, the plaintiffs say the Defendants Aey and Donohue deprived them of their Constitutional rights in violation of 42 U.S.C. § 1983. In Count 2, the plaintiffs say Defendant City of Akron deprived them of their Constitutional rights by failing to adequately train and discipline Aey and Donohue. In Counts 3, 4, and 5, the plaintiffs assert state law claims for malicious prosecution, unlawful arrest, and intentional infliction for emotional distress.

The Court considers the defendants' motion below.

## II. Summary Judgment Standard

Summary judgment is appropriate where the evidence submitted shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case. *Waters v. City of Morristown, Tenn.*, 242 F.3d 353, 358 (6th Cir.2001). A fact is material if its resolution will affect the outcome of the lawsuit. *Daughen-*

*baugh v. City of Tiffin, Ohio,* 150 F.3d 594, 597 (6th Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Once the moving party satisfies its burden, the burden shifts to the non-moving party to set forth specific facts showing a triable issue. *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It is not sufficient for the non-moving party merely to show that there is some existence of doubt as to the material facts. *Id.*

In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the non-moving party. *National Enters., Inc. v. Smith,* 114 F.3d 561, 563 (6th Cir.1997). Ultimately the Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Terry Barr Sales Agency, Inc. v. All-Lock Co.,* 96 F.3d 174, 178 (6th Cir.1996) (internal quotations omitted).

### III. Analysis

#### A. Kathleen Feathers

■ As a preliminary matter, the Court addresses Kathleen Feathers involvement as a plaintiff. The plaintiffs failed to respond to the defendants' motion for summary judgment against her. The undisputed evidence shows that she was never arrested, searched, or constrained. The plaintiffs' do not allege she was threatened by the defendants or present evidence indicating she suffered any damages. Therefore, the Court grants the defendants' motion for summary judgment on all claims with respect to Kathleen Feathers.

#### B. Thomas Feathers's § 1983 claim

Thomas Feathers sues Officers Aey and Donohue under § 1983. This statute provides recovery for constitutional depriva-

tions suffered under the color of state law. 42 U.S.C. § 1983 (2001) (stating that every person who, under color of state law, causes "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured...."); *Foy v. City of Berea,* 58 F.3d 227, 229 (6th Cir.1995) ("In order to prevail in a section 1983 action, the plaintiff must prove that some conduct by a person acting under color of state law deprived the plaintiff (or her decedent) of a right secured by the Constitution or other federal laws.").

Aey and Donohue seek summary judgment on the plaintiffs' § 1983 claims. They contend the plaintiffs have not offered sufficient evidence of their alleged constitutional deprivations. They also raise the doctrine of qualified immunity as a defense to liability.

■ The doctrine of qualified immunity shields state actors from liability based on their discretionary acts. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (holding that "government officials performing discretionary functions generally are shielded from liability for civil damages"). In so doing, the doctrine gives state actors the freedom to perform their official duties without fear that even a slight misstep will trigger their financial ruin. *Wyatt v. Cole,* 504 U.S. 158, 167, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992) ("Accordingly, we have recognized qualified immunity for government officials where it was necessary to preserve their ability to serve the public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service.").

■ State actors lose this immunity when they violate clearly established constitutional rights of which a reasonable person should have known. *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727 (holding that

qualified immunity shields state actors only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). The doctrine thus offers no solace to "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

The United States Court of Appeals for the Sixth Circuit has set forth a three-step process for evaluating claims of qualified immunity:

> First, we determine whether a constitutional violation has occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Williams v. Mehra,* 186 F.3d 685, 691 (6th Cir.1999) (en banc) (quotations omitted) (citing *Dickerson v. McClellan,* 101 F.3d 1151, 1157–58 (6th Cir.1996)).

Accordingly, in analyzing the plaintiffs' § 1983 claims, the Court looks first to whether they offer sufficient evidence of a constitutional violation. If so, the Court decides whether the violation involved a clearly established constitutional right of which a reasonable person would have known.

1. Analysis of whether there was cause to detain Thomas Feathers

First, the plaintiffs challenge the constitutionality of the investigative stop and resulting search. They say the defendants did not have reasonable suspicion to conduct a stop and search.

The Fourth Amendment prohibits "unreasonable searches and seizures." [1] U.S. Const. amend. IV. Evidence recovered from an illegal search is inadmissible. *Weeks v. United States,* 232 U.S. 383, 398, 34 S.Ct. 341, 58 L.Ed. 652 (1914). Further, evidence recovered indirectly from an illegal search or seizure is also inadmissible as "fruit of the poisonous tree." *Segura v. United States,* 468 U.S. 796, 804, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984); *Wong Sun v. United States,* 371 U.S. 471, 484–85, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 393–93, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

Under the Fourth Amendment, a search absent a warrant is per se unreasonable, "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). One such exception is for searches incident to a lawful arrest. *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

■ When conducting a search incident to arrest, police may search items within the "immediate control" of the person arrested. *Id.* at 763, 89 S.Ct. 2034. The Supreme Court has construed the area within a person's immediate control to include the "area from within which he might gain possession of a weapon or destructible evidence." *Id.*

The Fourth Amendment limits police officers' authority to detain individuals. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons ... against unreasonable ... seizures ...

---

**1.** Like the Sixth Amendment, the Fourth Amendment applies to the States through the Fourteenth Amendment. *See Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

shall not be violated."). Specifically, an officer cannot arrest an individual absent probable cause, i.e., a "fair probability" that the individual has either committed or intends to commit a crime. *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Further, an officer cannot even briefly detain an individual unless the officer reasonably suspects the individual has been involved in criminal activity. *See Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

In *Terry,* the Supreme Court explained that an investigatory stop occurs when police use some form of coercion: "Obviously, not all personal intercourse between policemen and citizens involve seizures of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred." *Id.* at 19 n. 16, 88 S.Ct. 1868 (internal quotations omitted). The test is whether, considering all of the circumstances, "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.*

█ Here, Feathers had no ability to end the contact with Officers Aey and Donohue. When he approached the door to his house, he was taken to the floor. He was not free to leave the area. He was seized.

Because Feathers was subjected to a *Terry* stop, the question turns to whether Officers Aey and Donohue had a sufficient justification for making such a stop. They did not.

█ Police officers may initiate an investigatory detention only if they have reasonable suspicion of criminal activity. *Id.* at 21–22, 88 S.Ct. 1868. An officer must be able to point to specific and articulable facts, together with rational inferences drawn from those facts, that reasonably suggest criminal activity has occurred or is imminent. Reasonable suspicion is based on the totality of the circumstances and has been defined as requiring "articulable reasons" and "a particularized and objective basis for suspecting the particular person … of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

█ Information from an anonymous informant may provide reasonable suspicion to conduct an investigatory detention. *See Alabama v. White,* 496 U.S. 325, 326–27, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). However, because any anonymous informant does not bear the responsibility of having to answer for misinformation, an anonymous tip must bear some evidence of reliability. Courts assess the reliability of an anonymous tip under the totality of the circumstances. *Illinois v. Gates,* 462 U.S. 213, 230–31, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

Typically, courts have found reasonable suspicion for a stop only when the police know the tipster to be reliable or when the tip contains independently verifiable details showing knowledge. *See, e.g., United States v. Taylor,* 162 F.3d 12, 19–20 (1st Cir.1998) (finding reasonable suspicion to stop suspect's car because tip from known, reliable informant provided specifics as to make and color of car, its registration number, description of occupants, and neighborhood where they were making drug drops); *United States v. Villalobos,* 161 F.3d 285, 290–91 (5th Cir.1998) (finding reasonable suspicion to stop suspect's vehicle because anonymous tip described, and police corroborated, the vehicle, its point of entry into United States, and its route); *United States v. Harris,* 39 F.3d 1262, 1269 (4th Cir.1994) (finding reasonable suspicion to stop a driver because reliable informant described suspect and car and correctly predicted future action); *United States v. Walker,* 7 F.3d 26, 31 (2d

Cir.1993) (finding reasonable suspicion to stop individual based on corroborated information from anonymous informant regarding individual's appearance and travel plans).

In *White*, the Supreme Court found an anonymous tip could support an investigatory stop only because the tip contained sufficient predictive information to show its reliability. 496 U.S. at 331, 110 S.Ct. 2412. The anonymous informant told police that the defendant would leave a particular apartment at a particular time in a particular vehicle, that she would be going to a particular motel, and that she would be in possession of cocaine. Because the information was corroborated by independent police work, the Court found that, while a "a close case," the anonymous tip, "as corroborated, exhibited sufficient indicia of reliability to justify the investigatory stop." *Id.*

In *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), the Supreme Court found insufficient evidence to create reasonable suspicion necessary for a *Terry* stop under circumstances similar to those presented in this case. 529 U.S. at 270–74, 120 S.Ct. 1375. An anonymous caller reported to police that a young black male, wearing a plaid shirt, was standing at a particular bus stop and carrying a gun. Officers went to the bus stop and saw three black males. One of the males, J.L., was wearing a plaid shirt. Although the officers did not observe any other evidence that raised suspicion of illegal conduct, one of the officers frisked J.L. and seized a gun from his pocket.

In finding this stop illegal, the Court held an anonymous tip indicating a person is carrying a gun is not, without more, sufficient to justify a police officer's stop and frisk of that person. *Id.* at 272, 120 S.Ct. 1375. The police officers' suspicion that J.L. had a weapon did not come from their own observations but solely from a call made from an unknown location by an unknown caller. Because it gave no predictive information that would allow the officers to test the informant's knowledge or credibility, the tip lacked sufficient indicia of reliability to provide the reasonable suspicion needed to make a *Terry* stop. "An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity." *Id.; see also United States v. Wells*, 223 F.3d 835, 839 (8th Cir.2000) ("An anonymous tip, however, is insufficient in itself to support a finding of probable cause."); *United States v. Payne*, 181 F.3d 781, 790 (6th Cir.1999) ("The tip in this case had none of the indicia of reliability that courts traditionally examine. It was, so far as the record reveals, anonymous. It lacked detail and failed to predict any future events that could be monitored to provide corroboration.").

■ Here, Officers Aey and Donohue stopped Thomas Feathers on his own porch based solely on a tip from an anonymous source. They stopped him based upon an anonymous tip from an informant the officers knew nothing about even though the tip itself gives no clear evidence of any illegal activity. The tipster only said "he pointed something at me … I don't know what he pointed, I don'[t] even know this guy." (Defs.' Ex. A–2). Given the vacuousness of the tip, Officers Aey and Donohue had scant evidence to stop Feathers, especially on his own porch.

Accordingly, the officers did not have the reasonable suspicion necessary to stop Feathers under *Terry*.

2. Analysis of whether evidence of the knife was illegally obtained

Second, the Court considers whether Officers Aey and Donohue's improper deten-

tion of Feathers made the arrest illegal. The Court finds that it did.

■ The fruit of the poisonous tree doctrine provides that evidence discovered as the indirect result of a Fourth Amendment violation is inadmissible. *Segura*, 468 U.S. at 804, 104 S.Ct. 3380. Here, the officers seized Feathers in violation of the Fourth Amendment. And after being arrested on his own front porch, the officers conducted a search that led to discovery of a work tool. Although the prosecution dismissed the concealed weapon charge during trial, the arrest led to Feather's prosecution. Obviously, the officers would not have discovered the work knife Feathers had in his pocket while on his front porch absent Feather's illegal seizure.

### 3. Analysis of excessive force claim

■ Third, the plaintiffs say the Aey and Donohue used excessive force when securing him. The Fourth Amendment's prohibition of unreasonable seizures limits the amount of force a police officer may use during an arrest. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Specifically, officers may use only the degree of force necessary to effect an arrest. *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir.1997).

In *Graham*, the Supreme Court held that claims law enforcement officers have used excessive force during an arrest should be analyzed under the Fourth Amendment and its "reasonableness" standard. *Id.* at 395, 109 S.Ct. 1865. In determining the reasonableness of the force used under the Fourth Amendment, courts must carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests' against countervailing governmental interests at stake." *Id.* at 396, 109 S.Ct. 1865.

■ In assessing a particular use of force, the Court will not second-guess an officer's judgment from the comfort of chambers. Rather, the Court asks whether a reasonable officer on the scene would have employed a similar degree of force. *Smith v. Freland*, 954 F.2d 343, 345–47 (6th Cir.1992); *Monday*, 118 F.3d at 1104. In so doing, the Court remains mindful that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865.

■ Under the Fourth Amendment's "reasonableness" standard, the Court finds insufficient evidence to support the plaintiffs' claim of excessive force. The plaintiffs' do not directly respond to the defendants' motion for summary judgment to this aspect of the § 1983 claim. Nor does the plaintiffs present any evidence of particular injuries Thomas Feathers suffered during his arrest. Feathers never sought or received medical treatment for any physical or emotional injury arising from this incident. (Thomas Feathers Dep. at 105). Feathers testified that he sustained "just minor injuries" such as scrapes and abrasions, but "nothing serious, like nothing for hospital treatment." (Thomas Feathers Dep. at 84–85, 98). Taking all the evidence in the light most favorable to the plaintiffs, there is no showing Aey and Donohue's alleged use of force was unreasonable.

### 4. Analysis of qualified immunity defense

The Court must now consider whether Aey and Donohue are entitled to qualified immunity for the alleged constitutional violations surrounding the search and arrest of Thomas Feathers. As the plaintiffs have shown the existence of constitutional violations, the Court decides whether the

violations involved clearly established constitutional rights of which a reasonable person would have known.

The parties do not dispute that the right to be free from unreasonable seizures is clearly established. *Watkins v. City of Southfield*, 221 F.3d 883, 887 (6th Cir. 2000). Thus, the critical question is whether any reasonable officer in Aey and Donohue's position would know that they violated Feather's constitutional rights. Of course, at the summary judgment stage, the exact nature of the officers' conduct remains in doubt. Thus, drawing all inferences in favor of the nonmoving party, the Court looks only to whether Feathers has alleged " 'sufficient facts supported by sufficient evidence' " showing the officers acted in an objectively unreasonable manner. *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir.1996) (quoting *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir.1994)).

■■■■ The plaintiffs' have met this burden. As detailed above, the anonymous tip was insufficient to allow the officers to conduct a *Terry* stop. Without the *Terry* stop, there was no basis to effect a search or arrest Thomas Feathers. The plaintiffs also offers support for the proposition that Feathers complied with Officer Aey and Donohue's commands to take his hands out of his pockets and did nothing to provoke the manner in which he was arrested. No reasonable officer would believe he could stop a suspect without reasonable suspicion or arrest a suspect without probable cause without violating the Fourth Amendment.

Thus, Thomas Feathers offers sufficient evidence to defeat the officers' assertion of qualified immunity. Accordingly, the Court denies the defendants' motion for summary judgment on Thomas Feathers's § 1983 claim.

### C. Analysis of claims against the City of Akron

■■■■ With respect to the plaintiffs' claim against the Defendant City of Akron, they may not sue a municipality under § 1983 for an injury done solely by one of its employees. *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Instead, only when the execution of a government's policy or custom causes an injury may a government be liable under § 1983. *Id.* The inadequacy of police training may only serve as a basis for municipal liability if the failure to train amounts to deliberate indifference to the rights of persons with whom the police came into contact. *Berry v. City of Detroit*, 25 F.3d 1342, 1345 (6th Cir.1994) (citing *City of Canton v. Harris*, 489 U.S. 378, 388–89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). A municipality's deliberate indifference to the rights of persons with whom the police come into contact with transform its conduct into a "policy or custom" that is actionable under § 1983. *City of Canton*, 489 U.S. at 388–89, 109 S.Ct. 1197. The deliberate indifference standard may be met when a municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. *See Bd. of the County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (citing *Canton*, 489 U.S. at 390 n. 10, 109 S.Ct. 1197).

■■■■ The existence of a pattern of tortious conduct establishes notice. However, the plaintiffs have not offered any evidence of a series of unlawful *Terry* stops, arrests, or applications of force that would have given the City of Akron notice of the potential danger. There is no evidence showing a pattern of tortious violations of

this kind existed to put the City on notice that its training program was deficient. Furthermore, the plaintiffs do not offer any evidence suggesting the City of Akron has an official policy of falsely arresting and using excessive force on individuals. Instead, the plaintiffs imply that the conduct of Aey and Donohue demonstrates the City of Akron's inadequate training.

In light of the plaintiffs' failure to respond to the defendants' motion on this claim, and the lack of a material issue of fact that the City of Akron was deliberately indifferent, the Court grants summary judgment on the defendants' motion for this claim.

### D. Analysis of State Law Claims

The plaintiffs assert state law claims for malicious prosecution, false arrest, and intentional infliction of emotional distress.

■■■ Under Ohio law, political subdivisions generally are "not liable in damages in a civil action for injury, death, or loss to persons or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function" unless the plaintiff establishes that one or more of the five statutory exceptions apply. Ohio Rev. Code § 2744.02(A) (2001); *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 913 (6th Cir.1995). As police officers, Aey and Donovan's alleged actions were in performance of a governmental function. Ohio Rev.Code § 2744.01(C)(2)(a) (defining "[t]he provision or nonprovision of police" as a governmental function); *Ziegler v.*

*Mahoning County Sheriff's Dep't*, 137 Ohio App.3d 831, 835–36, 739 N.E.2d 1237, 1241 (2000). None of the five statutory exceptions listed in Ohio Rev.Code § 2744.02(B) apply to Aey or Donovan's alleged actions while fulfilling a governmental function. *See Ziegler*, 137 Ohio App.3d at 836, 739 N.E.2d at 1241–42 (stating Ohio Rev.Code § 2744.02(B) does not create an exception from immunity for intentional torts). Under Ohio Rev.Code § 2744.02, Defendant City of Akron is entitled to immunity from the plaintiffs' state law claims.

Since none of the statutory exceptions of Ohio Rev.Code § 2744.02(B) apply, the Court need not consider whether any of the defenses set forth in Ohio Rev.Code § 2744.03(A) apply to the City of Akron. *Ziegler*, 137 Ohio App.3d at 836, 739 N.E.2d at 1241 (citing *Cater v. City of Cleveland*, 83 Ohio St.3d 24, 31–32, 697 N.E.2d 610, 617 (1998)); *see also Sargi*, 70 F.3d at 913. Therefore, the Court grants summary judgment to the City of Akron on the plaintiffs' malicious prosecution, false arrest, and intentional infliction of emotional distress claims.

■■■ With respect to Defendants Aey and Donovan, Ohio Rev.Code § 2744.03(A)(6)(b) provides limited immunity to political subdivision employees. When engaged in governmental functions, such employees are immune from tort liability unless they act "with malicious purpose, in bad faith, or in a wanton or reckless manner ..." Ohio Rev.Code § 2744.03(A)(6)(b).[2]

---

2. "Malice" is the willful and intentional design to injure or harm another, usually seriously, through conduct that is unlawful or unjustified. *Cook v. City of Cincinnati*, 103 Ohio App.3d 80, 90, 658 N.E.2d 814, 821 (1995); *Piro v. Franklin Twp.*, 102 Ohio App.3d 130, 139, 656 N.E.2d 1035, 1041 (1995). "Bad faith" includes a dishonest purpose, conscious wrongdoing, or breach of a known duty through some ulterior motive.

*Cook*, 103 Ohio App.3d at 90–91, 658 N.E.2d at 821; *Piro*, 102 Ohio App.3d at 139, 656 N.E.2d at 1041. "Wanton" misconduct refers to one's failure to exercise any care whatsoever. *Fabrey v. McDonald Police Dept.*, 70 Ohio St.3d 351, 356, 639 N.E.2d 31, 35 (1994); *Hawkins v. Ivy*, 50 Ohio St.2d 114, 363 N.E.2d 367 (1977) (syllabus). "Reckless" refers to conduct that causes an unreasonable

■ As discussed above, Officers Aey and Donovan's actions in searching and arresting Thomas Feathers were objectively unreasonable. Nonetheless, the plaintiffs have not come forward with any evidence showing that Aey and Donovan acted in an intentional manner to injure or hurt Feathers, as required by the definitions of "malice," "bad faith," and "wanton."

The Court also notes that even if Aey and Donovan were not entitled to immunity on the state law claims, the plaintiff has failed to respond to the defendants' motion for summary judgment on these claims. Generally, undeveloped arguments are waived. *See United States v. Lanzotti,* 205 F.3d 951, 957 (7th Cir.2000) (saying "[i]t is not this court's responsibility to research and construct the parties' arguments."); *Bratton v. Roadway Package Sys., Inc.,* 77 F.3d 168, 173 n. 1 (7th Cir. 1996). Therefore, the Court grants the Aey and Donohue's motion for summary judgment on the plaintiffs' state law claims.

### IV. Conclusion

For the reasons discussed above, the Court grants the defendants' motion for summary judgment with respect to Plaintiff Kathleen Feathers. The Court also grants the defendants' motion for summary judgment on Plaintiff Thomas Feathers's claim against Defendant City of Akron and his state law claims. The Court denies the defendants' motion for summary judgment on Thomas Feathers's § 1983 claim.

IT IS SO ORDERED.

risk of harm and is "substantially greater than that which is necessary to make his conduct negligent." *Thompson v. McNeill,* 53 Ohio St.3d 102, 104–05, 559 N.E.2d 705, 708 (1990) (quoting Restatement (Second) of Torts § 500 (1965)).