**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Victor Manuel SANTAMARIA– HERNANDEZ, Defendant– Appellee.**

**No. 91–50376.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 6, 1992.

Decided July 7, 1992.

David P. Curnow, Asst. U.S. Atty., San Diego, Cal., for plaintiff-appellant.

Jeanne G. Knight, Asst. Federal Public Defender, San Diego, Cal., for defendant-appellee.

Before: CANBY, REINHARDT and WIGGINS, Circuit Judges.

CANBY, Circuit Judge:

The government appeals the district court's order suppressing evidence obtained after the automobile of the defendant, Victor Manuel Santamaria–Hernandez, was stopped by border patrol agents. The pivotal issue is whether the "founded suspicion" essential to the stop of Santamaria's car may be based in part on events occurring after the border patrol car turned on its red lights and siren, but before Santamaria's car was actually stopped after a chase. The government argues that the Supreme Court decision of *California v. Hodari D.*, —— U.S. ——, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), decided after the district court had ruled, allows founded suspicion to be based on events occurring during the chase. We agree, and accordingly we reverse.

## FACTS

On October 28, 1990, a border patrol agent stationed atop a viewpoint overlooking the San Ysidro, California Port of Entry from Mexico received a radio message that suspected illegal aliens had crossed the border and were walking north along Interstate 5. Shortly thereafter, the agent saw a group of pedestrians cross Interstate 5 on foot on the United States side of the border. The agent lost sight of them when they neared a set of bushes behind a Burger King and a Union 82 market, and he did not see them again. The agent testified that he suspected that they were illegal aliens because, in his experience, all of those who cross Interstate 5 on foot are illegal aliens, and because they went to a

place well-known as a staging area for smuggling illegal aliens.

A few minutes later, the agent saw a yellow Ford Maverick with a blue fender and a black top leave the parking lot of the Burger King and the Union 82 market. The car stopped for 20–30 seconds before entering the street, which the agent identified as a counter-surveillance tactic. The driver did not go north on Interstate 5, but instead went south toward Mexico and then turned around just before the border and proceeded north on Interstate 5. The agent testified that this circuitous route is a common counter-surveillance tactic used by smugglers of illegal aliens, who turn north only if they believe they are not being watched. The agent then notified other agents in the area that the car was proceeding north and that he suspected that it was transporting illegal aliens.

Two agents in a border patrol car spotted the vehicle in question and followed it. They could see two people in the vehicle (the driver and a front seat passenger) and noted that it was traveling 50–55 miles per hour. When the driver of the vehicle appeared to detect the border patrol car (before the latter activated its lights or siren), he accelerated, moved over to the left side of the freeway, and began weaving in and out of traffic. The agents then activated the emergency lights and siren.

At that point, the agent saw three heads "pop up" in the back seat of the Maverick, and the car speeded up to 70 to 80 miles per hour. It exited the freeway and immediately reentered heading south. The agents chased the Maverick for approximately five miles, finally stopping it at the San Ysidro Port of Entry, approximately 20 feet from the border to Mexico. After they stopped the car, the agents restrained Santamaria, the driver, and removed him from the Maverick.

A federal grand jury indicted Santamaria for transporting illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(B). The district court subsequently granted Santamaria's motion to suppress on the ground that the agents lacked founded suspicion to stop him at the time they activated their emergency lights and siren. The government now appeals that ruling.

## DISCUSSION

### I. When was Santamaria seized?

The district court's ruling that "seizure" occurred at the time the border patrol car turned on its lights and siren was based on our precedent at the time. We so held in *United States v. Morrison*, 546 F.2d 319, 320 (9th Cir.1976), and stated that "[t]he command [to halt] must be valid when given; its character is not changed by the motorist's response." *Id.* at 320. Thus, founded suspicion had to exist "at the time the officers initiate the stop." *United States v. Fouche*, 776 F.2d 1398, 1402 (9th Cir.1985); *accord United States v. Robert L.*, 874 F.2d 701, 703 (9th Cir.1989). The district court, relying on *Robert L.*, did not consider any of the post-siren events in determining whether or not the police had a founded suspicion for the stop.

The government does not dispute the district court's reading of our cases but argues that the subsequent decision of the Supreme Court in *Hodari D.* changes the point at which seizure must be deemed to occur. The government's argument is compelling.

*Hodari D.* involved some youths who ran away from two approaching police officers. One of the youths (Hodari) ended up running directly toward another police officer; Hodari did not see the officer until he was almost upon him, at which time he tossed away what appeared to be a small rock, which turned out to be crack cocaine. A moment later, the officer tackled and handcuffed Hodari. *Hodari D.*, 111 S.Ct. at 1549. The question before the Supreme Court was whether the crack cocaine should have been suppressed because, at the time the cocaine was dropped, Hodari had been "seized" within the meaning of the Fourth Amendment.[1] As the Supreme

---

1. The time of seizure was crucial because if Hodari was not seized at the time he disposed of

the cocaine, the cocaine had been abandoned

Court noted, this question was relevant to the existence of founded suspicion, because the officer's seeing Hodari disposing of the crack cocaine could provide founded suspicion for the subsequent tackling. *Id.* at 1549.

The Court ruled that a seizure does not occur if, in response to a show of authority, the subject does not yield; in that event, the seizure occurs only when the police physically subdue the subject. *Id.* at 1550. "In sum, assuming that [the officer's] pursuit in the present case constituted a 'show of authority' enjoining Hodari to halt, since Hodari did not comply with that injunction *he was not seized until he was tacked."* *Id.* at 1552 (emphasis added).

Santamaria argues that *Hodari D.* should be limited to its facts, so that it would apply to this case only if Santamaria had tossed contraband or illegal aliens from his car. That argument ignores the main point of *Hodari D.*—that one who flees upon a show of authority is not seized until he or she is physically apprehended. It was the flight, not the discarding of the rock cocaine, that postponed the point of seizure in *Hodari D.* And it was flight that postponed the seizure of Santamaria.

Nor is there any reason to conclude that the reasoning of *Hodari D.* would not apply to automobile chases as well as foot chases. Indeed, the Supreme Court in *Hodari D.* relied in part on *Brower v. Inyo County*, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), which involved a twenty-mile automobile chase ending in a fatal crash into a police barricade. The *Hodari D.* opinion noted that in *Brower*, the Court "did not even consider the possibility that a seizure could have occurred during the course of the chase because ... that 'show of authority' did not produce his stop." *Hodari D.*, 111 S.Ct. at 1552 (quoting *Brower*, 489 U.S. at 597, 109 S.Ct. at 1381).

It is clear, then, that *Hodari D.* governs this case if it is to be applied retroactively. In *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987), the Supreme Court stated that any "new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases ... pending on direct review or not yet final." We have interpreted this directive to require the retroactive application of a Supreme Court decision broadening the permissible scope of automobile searches. *United States v. Sanchez*, 944 F.2d 497, 499 (9th Cir.1991). By the same token, we must apply *Hodari D.* retroactively here.

We conclude, then, that Santamaria was not "seized" for fourth amendment purposes until he was physically apprehended by the border patrol agents at the end of the chase. The determination whether agents have founded suspicion to justify a stop may take into account all of the events that occur up to the time of physical apprehension of a suspect who flees.

## II. *Was there founded suspicion for the stop?*

The determination whether founded suspicion[2] existed must be based on "the totality of the circumstances—the whole picture."[3] *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). "[T]he detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* at 417–18, 101 S.Ct. at 695; *see also United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) ("Fourth Amendment requires 'some minimal level of objective justification' for making the stop.") (quoting *INS v. Delgado*, 466 U.S.

and suppression was therefore improper. *Hodari D.*, 111 S.Ct. at 1549.

2. "In this circuit the terms 'founded suspicion' and 'reasonable suspicion' are used interchangeably to describe the cause that is sufficient to justify an investigatory stop." *United States v. Thomas*, 863 F.2d 622, 624 n. 1 (9th Cir.1988).

3. We review de novo the district court's ruling that there was no founded suspicion for the stop of Santamaria's car. We review for clear error the findings of fact on which the district court based its conclusion. *Fouche*, 776 F.2d at 1402.

210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984)).

■ When the point of seizure is relocated to the time that Santamaria was pulled from his car, the totality of circumstances known to the agents presents such a compelling justification for the stop that we find no need to require the district court to address the motion again on remand. No rational trier of fact could find that the agents lacked a founded suspicion. The circumstances were: (1) the first border patrol agent, alerted by radio that pedestrians were heading north across the border, saw a group of people cross Interstate 5 on foot, and the agent's experience was that only illegal aliens did so; (2) the suspected illegal aliens entered a "notorious smuggling staging area" and then disappeared from view; (3) Santamaria's Ford Maverick left the "staging area" soon afterward; (4) Santamaria's car waited 20–30 seconds before entering traffic, in a pattern that the agents identified as a counter-surveillance technique; (5) Santamaria took a circuitous route before heading north on Interstate 5, which was also known by the agent to be a counter-surveillance technique; (6) Santamaria accelerated and began weaving in and out of traffic after he appeared to notice the border patrol car behind him; (7) after the border patrol agent activated his siren and emergency lights, he saw three heads pop up in the back seat of the car from where the persons had apparently been hiding; (8) Santamaria did not stop in response to the emergency lights, but rather turned around and began proceeding south toward Mexico at 70–80 miles per hour; (9) Santamaria stopped his car only when it was blocked at the San Ysidro Port of Entry. In light of all of these factors taken together, the agents indisputably had founded suspicion that Santamaria was engaged in criminal activity by the time they pulled him from his car.[4]

## CONCLUSION

The order of the district court granting Santamaria's motion to suppress is re-versed, and the case is remanded for further proceedings.

REVERSED AND REMANDED.

---

4. We note that several of the factors contributing to founded suspicion preceded the agents' activation of their emergency lights and siren. This is not a case of an entirely random decision by the officers to stop a vehicle.