UNITED STATES of America,
Plaintiff,

v.

Heather Lea GRIFFITH and Emeterio
Rogelio Trujillo, Defendant.

No. 4:10–CR–00463–TUC–CKJ (CRP).

United States District Court,
D. Arizona.

Dec. 16, 2010.

Kimberly E. Hopkins, U.S. Attorneys Office, Tucson, AZ, for Plaintiff.

Greta Maria Vietor, Federal Public Defenders Office, Stephanie Kathryn Bond, Law Offices Of Stephanie K. Bond PC, Tucson, AZ, for Defendant.

## ORDER

CINDY K. JORGENSON, District Judge.

On November 23, 2010, Magistrate Judge Charles R. Pyle issued a Report and Recommendation [Doc. 51] in which he granted Defendant Trujillo's Motion to Suppress Evidence (No Reasonable Suspicion or Probable Cause) [Doc. 26], finding that "the officers did not have the requisite reasonable suspicion to stop [Defendants'] vehicle."[1] R & R [Doc. 51] at 20. No objections have been filed within the time provided by 28 U.S.C. § 636(b)(1). Further, pursuant to Rule 59, Federal Rules of Criminal Procedure, failure to file an objection waives a party's right to review.

Accordingly, after an independent review, IT IS ORDERED that the Report and Recommendation [Doc. 51] is ADOPTED.

### REPORT AND RECOMMENDATION

CHARLES R. PYLE, United States Magistrate Judge.

Pending before the Court is Defendants' Motion to Suppress Evidence. (Docs. 26, 34). Defendants argue law enforcement lacked the requisite reasonable suspicion to initiate a stop of their vehicle and the evidence seized as a result of the stop should be suppressed. (Doc. 26, pp. 2–4). Defendants did, in their Motion, dispute the probable cause to arrest but at the evidentiary hearing, defense counsel clarified that the defense was only disputing the stop of Defendants' vehicle. (*See* Doc. 47, Transcript of 10/26/10 Evidentiary Hearing ("TR") at 15). The Government contests the motion, arguing law enforcement relied on articulable facts supporting reasonable suspicion when the officers stopped Defendants' vehicle. (Doc. 30). On October 26, 2010, the Magistrate Judge

held an evidentiary hearing on the Motion. (Doc. 40). It is the Report and Recommendation of this Court that the District Judge, after her independent review, GRANT the Motion.

### *Credibility of the Witnesses from the Evidentiary Hearing*

The Ninth Circuit's model jury instruction instructs jurors, as the triers of fact, to consider the following in making a determination of witness credibility:

1. The witness's opportunity and ability to see or hear or know the things testified to;

2. The witness's memory;

3. The witness's manner while testifying;

4. The witness's interest in the outcome of the case, if any;

5. The witness's bias or prejudice, if any;

6. Whether other evidence contradicted the witness's testimony;

7. The reasonableness of the witness's testimony in light of all the evidence; and

8. Any other factors that bear on believability.

FedCrim–JI9C 1.7 Credibility of Witnesses.

At the evidentiary hearing, the Government presented the testimony of Immigration and Customs Enforcement ("ICE") Officer Carol Yazzie and ICE Officer Charmaine Harris. Officer Yazzie has worked as a tactical officer for ICE for approximately four years. (TR at 6). Officer Harris has worked as a tactical officer with ICE for about ten years. (TR at 35). Prior to working for ICE, Officer Harris was a police officer with the Tohono O'odham Reservation for nine years. (TR at 36).

---

1. On October 8, 2010, Defendant Griffith filed her Notice of Joinder [Doc. 34] to the Motion to Suppress.

The Defense presented the testimony of expert witness Tim Bright. (TR at 52). Mr. Bright is an accident reconstructionist with 42 years of experience investigating accidents and working with vehicle movement. (TR at 53). Mr. Bright has owned his own company, Bright's Vehicle Dynamics, since the early eighties. (TR at 53).

Mr. Bright's experience with the movement of vehicles and accident reconstruction is extensive. His history includes over 12 years with the Tucson Police Department during which time he did in-depth investigations into the cause and prevention of accidents. (TR at 53). He also taught auto accident investigation in the field to police recruits. (TR at 53). His other experiences with the police department include working in an accident alleviation program and serving on boards of inquiry to determine who was at fault and the degree of fault in auto accidents involving police officers. (TR at 54).

After leaving the police department, Mr. Bright studied accident reconstruction at a number of institutions including highly competitive programs at Northwestern and the Institute of Safety Analysis in Rockville, Maryland. (TR at 54–55). As part of his training in technical accident investigation, Mr. Bright learned about addressing the weights of vehicle, the handling characteristics of vehicles, the visibility of the drivers, and the visibility that witnesses may have of drivers, occupants and their actions. (TR at 55).

Mr. Bright has testified as an expert witness in federal court and state court throughout Arizona and California on both accident reconstruction and non-collision vehicle movements. (TR at 55). He has been a guest expert at the Arizona Trial Lawyers Association, the University of Arizona Law School, and the Arizona Board of Trial Advocacy. (TR at 55).

In this case, Mr. Bright offered an expert opinion on the officers' ability to see through the rear tinted window of Defendants' vehicle as well as whether Defendants' vehicle would have appeared to be heavily laden. To prepare his opinion, Mr. Bright reviewed all the police reports connected to this case, a copy of the photo disk taken on the night of the stop, a video tape taken by another investigator and some still photographs taken by another investigator. (TR at 56). Mr. Bright also went to the area of milepost 106 along State Route 86 and a couple miles west of the milepost to view the lighting. (TR at 56). He also inspected Defendants' vehicle and photographed it and its vehicle identification number ("VIN") plate. (TR at 56). From the VIN number, Mr. Bright ordered a report on what equipment the vehicle had so he could determine its weight and offer an opinion on whether it was heavily laden. (TR at 57). He also inspected the tint on the rear window of the vehicle and used a "tint meter" to determine how much light could filter through the tint. (TR at 57).

All three of the witnesses in this case testified on the witness stand in a forthright way. There are, however, critical disagreements between the ICE officers and the defense's expert witness as to whether the officers could see the burlap backpacks of marijuana stacked in the back of Defendants' minivan considering the tint on the back window and whether the vehicle would have appeared to be "heavily laden" or riding low.

Additionally, the ICE officers both cited a number of facts they say they considered when initiating a stop of Defendants' vehicle; these facts were not contained in their reports after the incident. The officers only stated in their reports that they could see the backpacks of marijuana in plain view and they observed that the vehicle appeared heavily laden.

The officers agreed that the purpose of writing a report post-incident is to summarize the important aspects of the investigation so they may later use a report to refresh their recollection. An incident report also functions as a check on an officer's testimony. Critical differences between a report written just after an incident and testimony given in an evidentiary months after the incident causes this Court some concern. While it is reasonable that not all the details of an investigation be contained in a report, factors that the officers considered in deciding to stop a vehicle are critical to an investigation. The Court is particularly concerned with the number of factors cited by the officers during the evidentiary hearing that were not contained in either of their reports.

This Court critically examined the factors identified by the officers at the evidentiary hearing that were not present in their reports. After analyzing those factors, the Court gives many of them minimal weight. While both Officer Yazzie and Officer Harris testified that they had a good recollection of the events that occurred on February 4, 2010, the purpose of a police report is to contain the important details of an investigation so the officers can later use that report if necessary to refresh their recollection. (TR at 33). A report also corroborates an officer's testimony at a later hearing. The officers failure to put facts in their report that they say supported their reasonable suspicion to stop Defendants' vehicle detracts from the weight of many of those factors.

### Factual Findings

On February 4, 2010, ICE Officers Yazzie and Harris were working a 4:00 p.m. to 2:00 a.m. shift patrolling the roads within the Tohono O'odham Nation including State Route 86. (TR at 6, 36, 7, 37). That day the officers were conducting area surveillance and narcotics tracking in the area of Pisinemo, Arizona. (TR at 6, 36–37). The Pisinemo Village is part of the Tohono O'odham Nation and is located approximately 35 miles from Sells, Arizona. (TR at 7).

The officers encountered Defendants along State Route 86 at approximately 12:30 a.m. (TR at 10). As described by Officer Yazzie, State Route 86 is a two-lane highway that runs east and west. (TR at 7). The speed limit on the road is 65 miles per hour. (TR at 6). The road has no lighting, only light from the traffic that travels along it. (TR at 7–8). Officer Yazzie described the conditions that evening as "dark, very little starlight." (TR at 10). There is no formal shoulder along the road; instead, a white line marks the driving lane and then approximately a foot of asphalt extends beyond that line. (TR at 7).

As a tactical officer with ICE for the past four years, Officer Yazzie has come to know State Route 86 as a common smuggling route for narcotics and aliens. (TR at 8). She has tracked several backpacking groups along that highway, particularly for her, between milepost 100 and 108. (TR at 8–9).

On the morning of the stop, the officers were traveling in an unmarked Dodge pickup truck. (TR at 9, 37). Officer Harris was driving. (TR at 10, 37). She testified that State Route 86 was "busy with traffic, east and west traffic." (TR at 10).

The officers drove up behind Defendants' vehicle as both vehicles were traveling eastbound. (TR at 10). Officer Harris testified that she and Officer Yazzie were on their way back to their office. (TR at 38). During the evidentiary hearing, both officers testified that Defendants' vehicle was traveling at a slow rate of speed. Officer Yazzie testified that Defendants were traveling in a red Dodge Caravan at

approximately 50 to 55 miles per hour. (TR at 10). Officer Harris did not initially mention the speed of Defendants' vehicle but rather stated she drove up behind Defendants' vehicle and did not pass it right way because she was waiting for a break in the westbound traffic. (TR at 38). Later Officer Harris stated that they drove up on Defendants' vehicle because it was driving at a slower rate of speed that 65 miles per hour. (TR at 39).

Both officers agreed on cross-examination that in their reports of the incident they did not mention anything about Defendants' vehicle traveling at a slow rate of speed. (TR at 16–17, 44). Officer Harris also agreed on cross-examination that when she provided the testimony for the case to the grand jury she did not say anything about Defendants' vehicle traveling slower than 65 miles per hour or driving slowly at all. (TR at 44).

The Court is not convinced that Defendants' vehicle was traveling at so slow a speed as to be suspicious to the officers. Both officers wrote reports connected to this incident and neither officer thought the speed of Defendants' vehicle was significant enough to include in a report. Further, Officer Harris did not include this factor in her grand jury testimony. It is believable that Defendants were traveling at a slower rate of speed than the officers intended to travel on their way back to their office toward the end of their shift. It is also believable that the officers traveled behind Defendants' vehicle for some amount of time as they waited for a break in the heavy traffic traveling westbound. Further, it is believable that Defendants' vehicle may have been traveling slower than 65 mph on a two-lane highway with no lighting and heavy traffic. The Court does not give much weight to the officers' testimony that the speed of Defendants' vehicle was suspicious to them.

Both officers testified that they encountered Defendants' vehicle around milepost 102. (TR at 10, 38). Again, this is a fact that neither officer included in her report on the incident. (TR at 16). This fact, however, is not critical to a determination of reasonable suspicion. It seems possible that while the officers did not include this fact in their report, as it was not critical to their stop of the vehicle, they may have followed Defendants' vehicle for four miles. The officers testified that they drove up on Defendants' vehicle, waited for a break in traffic, looked into the back of Defendants' vehicle and then initiated a stop of the vehicle. It is possible those actions occurred across a four mile span and the parties agree that the stop occurred around milepost 106. No testimony was presented to suggest the distance that the officers followed Defendants' vehicle between the initial encounter and the stop was suspicious.

As the officers approached Defendants' vehicle, they both testified that they saw what appeared to them to be square backpacks of marijuana. At the evidentiary hearing, the officers testified in great detail about how the backpacks looked. Exactly what the officers could see was significantly contested by the defense and the defense's expert. Critical to the defense was the lack of detail in the officers' initial reports and Officer Harris's grand jury testimony. Also critical was the amount of light available for the officers looking into Defendants' rear window and the affect of the dark tint on that window.

Officer Yazzie testified that she observed "the back window to—to have square objects pressed up against the back of the window." (TR at 10). She asked Officer Harris to move closer to Defendants' vehicle and at that time Officer Yazzie testified that she observed "what I recognized to be at that time brown burlap

pressed up against the window and in the shape of a large square, two side by side." (TR at 11). Officer Yazzie testified that even though it was dark out that night, she observed the bundles because the headlights from vehicles traveling in the heavy westbound traffic illuminated the interior of Defendants' vehicle. (TR at 11).

Officer Yazzie also testified that as they moved closer to Defendants' vehicle, she asked Officer Harris to shine her brights on the back window. (TR at 11, 33, 38). She testified that the headlights from her vehicle gave her a better view of what was in the back of Defendants' vehicle. (TR at 32). Officer Yazzie testified that with the brights on, she "recognized what appeared to be marijuana backpacks stacked against the rear window." (TR at 11). She later described the bundles as "pressed up against the back window on two square objects approximately two feet across." (TR at 12). Officer Yazzie testified she "saw the imprint of the burlap, which was small brown squares, pressed up against the back window." (TR at 12–13).

Officer Yazzie agreed on cross-examination that she did not put into her report that she viewed two square objects approximately two feet across; rather she said only that she observed large burlap backpacks stacked against the rear window of the van. (TR at 18). She also agreed that she did not put in her report that she could see the imprint of the burlap backpack up against the rear window of Defendants' vehicle. (TR at 30). She stated the bundles were uncovered, in plain view, and covering the entire rear window except for approximately six inches along the top of the window. (TR at 13). Officer Yazzie agreed on cross-examination that she did not put anything in her report about asking Officer Harris to turn on the brights and viewing the bundles with the brights on. (TR at 17).

Officer Harris also testified that she observed "what appeared to be large bundles of backpacks in the rear of the vehicle." (TR at 38). Officer Harris agreed on cross-examination that while she testified that she turned her brights on to get a better view of the back of Defendants' vehicle, this was not a fact that she put in her report, nor was it a fact she included in her grand jury testimony. (TR at 43). Officer Harris stated that the bundles "appeared to be large square backpacks, which they normally are." (TR at 39). Officer Harris also stated the bundles were in plain view and that they covered the back window except for the top part of it. (TR at 39–40).

The Court's first concern with the testimony about the marijuana backpacks is the vivid detail Officer Yazzie provided during the hearing. Officer Yazzie testified that she saw two two-foot square backpacks and that she viewed the detail of the imprint of the burlap, which was small brown squares, pressed up against the back window. It is difficult to find it credible that Officer Yazzie allegedly saw and remembered the detail of the burlap including the imprint of small brown squares but she failed to include any of these details in her report. In her report, Officer Yazzie described her observation, the critical reason for initiating the stop, as viewing large burlap backpacks stacked against the rear window of the van.

The testimony of Officers Harris and Yazzie was contradicted by the testimony of the defense's expert witness as to the ability of anyone to see through the dark tint on Defendants' rear window. Mr. Bright used a "tint meter" to assess the darkness of the tint and its affect on one's ability to see through the window. A tint meter is a certified instrument that Mr. Bright calibrates before every use. (TR at 75–76). Mr. Bright calibrates the tint me-

ter and then tests it against two factory-made samples of glass. (TR at 75–76). The tint meter tests the percent of light that can be transmitted through the tint. As an example, a reading of 77 means the tint is relatively light as it is permitting 77% of light to pass through the tint. (TR at 76).

Mr. Bright testified that he went out to the impound lot and used the tint meter to test the tint on the rear window of Defendants' vehicle. (TR at 77). The test revealed the tint on the vehicle allows only ten percent light through the tint. (TR at 77, *see also* Exhibit 13). Mr. Bright testified that the lower the number on the tint meter, the lower the amount of light that can penetrate through a window. (TR at 78). As an example, Mr. Bright offered that Arizona law only permits the driver's side and passenger side windows to have tint that is 33 percent plus or minus three. (TR at 78). As another example, a limo tint is typically zero to five percent. (TR at 78). Arizona law does not regulate the tint of other side windows or rear windows. (TR at 90).

In addition to testing the tint, Mr. Bright also took a photograph at the back of the vehicle that shows the reflective nature of the tint. (TR 79–80, Exhibit 15). The photograph shows the reflection of Mr. Bright, the photographer, as he takes the photograph. (Exhibit 15). Mr. Bright also offered testimony on a photograph taken by law enforcement after Defendants' vehicle was impounded. The photograph is taken at night with a bright light that appears to be shining through the center of the front windshield. (Exhibit 6). The photograph appears to be taken to show how the marijuana would have appeared to the officers from behind Defendants' vehicle. (TR at 80). Mr. Bright testified that the only thing that could be seen in the Defendants' vehicle with the light directly in the center or approximate-ly in the center of the windshield is an outline of something. (TR at 80, Exhibit 6). Mr. Bright testified that given the dark tint with a ten percent rating and a light shining directly through the front windshield into the interior of Defendants' vehicle, this photograph depicts what he would expect to see through the dark tint, which is the outline of something in the back. (TR at 81).

Based on his experience of using tint meters for the past ten to 15 years, Mr. Bright testified that headlights from on-coming traffic would not be able to illuminate the interior of Defendants' vehicle such that a person could actually discern that burlap sacks were in the back of the vehicle through the dark tint. (TR at 82–83). Mr. Bright testified that his opinion would be the same for headlights from a vehicle following behind Defendants' vehicle and shining light on the dark tint of the rear window. (TR at 82). Specific to the light of oncoming traffic, Mr. Bright testified that headlights are designed to shine some light into the oncoming lane but that most of the light is directed to the center of the roadway and to the right so as to avoid blinding drivers. (TR at 83). On cross-examination, Mr. Bright agreed that he had not tested Defendants' vehicle at night to see how the light actually looked from the front or back as he did not have access to the vehicle. (TR at 87–88). He did, however, feel confident giving his opinion that only an outline of what was in the vehicle could be seen because of the ten percent tint and his experience and training with how vehicles will or will not be illuminate with light. (TR at 91).

On re-direct, Mr. Bright again testified that it would be impossible to tell if the outline in the vehicle was a burlap sack, if the officers could see the outline at all. (TR at 92). Mr. Bright was also not convinced that the officers had light as bright

as the light in the photograph when they were driving and Defendants' vehicle was lit only from oncoming traffic headlights and the officers' vehicle headlights. (TR at 92, Exhibit 6). Even with the bright, intense light shining through the center of the front windshield in the photograph, Mr. Bright pointed out that he could only see an outline of what is in the back of the van. (TR at 92). He noted he could not see the burlap, the cloth seats, a jacket or anything else—only the outline. (TR at 92).

Mr. Bright's testimony was compelling. The tint on Defendants' vehicle looks dark in the photographs submitted as exhibits and as tested by Mr. Bright, it admits only ten percent light. The photograph taken by law enforcement with the marijuana bundles in the vehicle and a bright light shining through the windshield further corroborates Mr. Bright's testimony. (Exhibit 6). At best, only a rough outline of something in the vehicle can be seen. Frankly, if someone did not know that the outline was bundles of marijuana in the back of the vehicle, it is difficult to even discern whether the outline is of something in the back of the vehicle or whether it is an outline of the seats. (Exhibit 6). Further corroborating Mr. Bright's testimony is the fact that neither officer in her incident report describes in detail what they could see in the back of Defendants' vehicle and neither mentions the use of the brights. Based on the testimony, the Court finds the officers, at best, could see an outline of something in the back of Defendants' vehicle.

The officers also described the vehicle as traveling slowly and "heavily laden." (TR at 13, 39). When asked to explain what she meant by heavily laden, Officer Harris said "[i]t appeared to be heavier. It was— that there might be something in the back of it, either illegal aliens or contraband." (TR at 39). Officer Harris agreed on

cross-examination that she did not testify to the grand jury that the vehicle appeared heavily laden. (TR at 44–45). Officer Harris testified that she did not take a measuring tape and measure the distance from the ground to the vehicle to compare any difference between when the marijuana was in the vehicle and when it was not in the vehicle. (TR at 49).

The Government offered two photographs as proof of the heavily laden vehicle. One photograph was taken with the marijuana in the vehicle, the other without it. (Exhibits 5, 18). Officer Harris testified as to the two photographs taken of Defendants' vehicle once it was impounded by ICE. The first photograph, Exhibit 5, is taken with the marijuana bundles still in the vehicle and the tailgate closed. (TR at 42; Exhibit 5). The second photograph, Exhibit 18, is taken with the marijuana out of the vehicle and the tailgate open. (TR at 42, Exhibit 18). Neither photograph is taken with people in the vehicle.

The photographs are taken at different angles and appear to be taken at different heights. Exhibit 18 is a photograph taken closer to the vehicle. Officer Harris testified that a white line under the parked vehicle could be more easily seen in the photograph of the vehicle without the marijuana. She testified that she could see a difference around the muffler of the vehicle when the marijuana was in the vehicle compared to when the marijuana was taken out of the vehicle. (TR at 42). She states after the marijuana is taken out, "[y]ou can see the white line more down by the muffler—" (TR at 42).

The defense's expert analyzed the weight of the vehicle and presented detailed testimony supporting his ultimate opinion that Defendants' vehicle could not have appeared heavily laden. (TR at 67). To assess this factor, Mr. Bright began by obtaining the exact equipment of this par-

ticular Dodge Caravan through its VIN number. (TR at 58–60). The VIN number also gives the "gross axle weight ratio for the rear axle" and the "overall gross vehicle rating." (TR at 58). Based on the equipment on Defendants' particular Dodge Caravan, Mr. Bright determined the vehicle's "curb weight", its weight when the vehicle is parked at the curb and ready to drive, was 3,411.8 pounds. (TR at 61–63). The maximum "gross weight" of Defendants' vehicle, the total load that the vehicle can carry without exceeding the standards and the total load that can be applied to the front axle and the rear axle, was 5, 040 pounds. (TR at 61, 64). Thus, gross weight includes the curb weight and any cargo, passengers, etc. that a vehicle is carrying. (TR at 63). The gross weight on the rear or front axle cannot exceed 2,544 pounds. (TR at 64). If gross weight on a vehicle is exceeded, Mr. Bright testified that a person could make observations as to how low that vehicle would ride. (TR at 63).

Mr. Bright testified that the critical weight to determine if the rear of the vehicle appeared heavily laden would be the weight on the rear axle as Defendants' vehicle was carrying three passengers toward the back of the vehicle and the marijuana backpacks were in the back of the vehicle. (TR at 65). Thus, Mr. Bright calculated whether the weights of the three persons, as over-estimated at 300 pounds each, with the weight of the marijuana backpacks as stated in the Indictment, exceeded the gross vehicle weight limits for the rear axle. (TR at 65–66). Mr. Bright estimated three individuals at 300 pounds each for a total of 900 pounds and marijuana, 175 kilograms converted to 324 or 325 pounds dependent on how far the decimal is carried. (TR at 66). Knowing that the gross weight for the entire vehicle is 5440 pounds and the total curb weight is 1628 pounds, the rear axle could have carried 1181 pounds without exceed-

ing its maximum. (TR at 66). Thus, the 1200 pounds of over-estimated passenger weight and the marijuana weight is just above the gross weight for the rear axle. (TR at 66).

Mr. Bright concluded that the vehicle would not have been heavily laden on the night the officers initiated the stop. (TR at 67). Mr. Bright also offered examples of how the Government could have shown evidence of a heavily laden vehicle. (TR at 67–68).

Mr. Bright also testified as to the lack of reliability of the Government's offered photographs. Mr. Bright noted the photographs, Exhibits 5 and 18, are each taken from a different location and a different angle. (TR at 68–69). Mr. Bright noted the second photograph, Exhibit 18, appeared to be taken at a much closer angle or with a zoom lens as the background is not visible. (TR at 70). Mr. Bright opined that if someone wanted to determine whether there was any "sag in the rear based on the load of—or the weight of the vehicle" the camera used to take the photographs should have been set on a tripod and kept at a consistent spot while a photograph was taken with the marijuana in the vehicle and one without the marijuana. (TR at 69). Mr. Bright also suggested a tape measure or some measuring instrument should have been used in the photographs to measure the distance between the bumper of the vehicle and the ground so the photographs could show any difference of the vehicle being weighed down by the marijuana or lightened up without it. (TR at 69). Mr. Bright testified that using a consistent camera angle and height with a numeric measurement would be the way to scientifically show the effect of the marijuana weight in the vehicle. (TR at 69). Mr. Bright also testified that Exhibit 3 appeared to be a photograph taken with the marijuana in the

vehicle and it was another example of how the vehicle did not appear heavily laden. (TR at 70, Exhibit 3). Mr. Bright could not conduct his own test of whether the vehicle was heavily laden because when he inspected the vehicle its right rear tire was flat. (TR at 71). The tire did not appear flat on the night of the stop nor did the officers mention a flat tire. (TR at 71).

The Court is not convinced by the testimony that the vehicle appeared heavily laden. The photographs used by the Government to support this fact are not reliable. From the start, the photographs are not accurate because there are no people inside the vehicle. Also, it appears more of the white line under the vehicle is visible in the Exhibit 18 photograph because the photograph is taken at a closer and lower angle to the vehicle. There is no scientific measurement offered to show that the vehicle appeared heavily laden in the photographs and just by looking at them, it does not appear heavily laden. Further, defense's expert witness presented credible testimony that this particular Dodge Caravan carrying the weight of the marijuana and three large individuals on the rear axle would not have caused the vehicle to sag or appear heavily laden.

Officer Harris also testified that there had been a light rain that night. (TR at 38). She later stated that based on her knowledge, Border Patrol checkpoints usually do not operate during rain and that drug traffickers will take the opportunity when checkpoints are down to move their contraband. (TR at 40). Officer Harris did not put anything about rain in her report and she did not testify about rain being a factor for initiating the stop when she testified before the grand jury. (TR at 45). The Court gives this factor little weight. If the light rain was a meaningful reason for being suspicious of Defendants' vehicle, one of the officers would have put that fact in her report and/or Officer Harris would have testified about that fact during the grand jury hearing.

As the officers were following Defendants' vehicle, Officer Harris ran the vehicle's license plate. She determined that the vehicle was registered to a Heather Griffiths in Glendale, Arizona—just outside of Phoenix. (TR at 11–12, 38). Officer Yazzie testified that the vehicle registration location raised her suspicions because it was an out-of-area registration and the vehicle was traveling through the Tohono O'odham reservation in the middle of the night. (TR at 12). Officer Harris also testified that the Glendale registration raised her suspicions but agreed on cross-examination that it was not a factor she included in her report. (TR at 40,). On cross-examination, Officer Yazzie also agreed that it was common for vehicles to use State Route 86 and that it was not unusual to see a number of vehicles on that road. (TR at 29–30).

After their observations, Officer Harris turned on her red and blue emergency lights to initiate a stop of the vehicle. (TR at 13). Both officers testified that the vehicle was still moving when three individuals jumped out of it. Officer Yazzie stated the vehicle "did slow down and attempted to move off the—off to the shoulder or dirt." (TR at 14). The Officers both testified that while the vehicle was slowly moving, three individuals jumped out of the vehicle and ran into the desert. (TR at 14, 41). Officer Yazzie described the timing of the individuals jumping out of the vehicle as "the vehicle was still rolling quite slowly . . ." (TR at 14). Officer Yazzie agreed on cross-examination that she did not include in her report that Defendants' vehicle was still rolling when the three individuals fled from it. (TR at 28). Officer Harris testified that the vehicle came to a gradual stop and that the three individuals exited the

vehicle was it was still moving "at a slow, very slow rate." (TR at 41).

After the three individuals fled from Defendants' vehicle, Officer Yazzie jumped out of her vehicle and attempted to chase them but the individuals had already jumped a fence and fled into the desert. (TR at 14). The officers then conducted their stop of Defendants' vehicle and discovered the marijuana bundles.

### Standard for Review

 The Fourth Amendment prohibits an officer from stopping a vehicle without a reasonable or founded suspicion of criminal conduct at the time of the stop. *United States v. Rodriguez*, 976 F.2d 592, 594 (9th Cir.1992). Reasonable suspicion exists when an officer is aware of specific, articulable facts, which together with objective and reasonable inferences, form a basis for suspecting that the particular person to be detained has committed or is about to commit a crime. *United States v. Salinas*, 940 F.2d 392, 394 (9th Cir.1991). The determination whether reasonable suspicion exists must be based on "the totality of the circumstances—the whole picture." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). The facts are to be interpreted in light of a trained officer's experience, and the whole picture must be taken into account. *United States v. Sokolow*, 490 U.S. 1, 8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

 In a motion to suppress the Government has the burden of production to put forward the "specific and articulable facts." *United States v. Willis*, 431 F.3d 709, 715 n. 5 (9th Cir.2005) (quotations omitted). The defendant has the burden of proof on the motion to suppress. *Id.*

Resolving this Motion is a question of credibility on the alleged facts supporting reasonable suspicion. As the Ninth Circuit instructs jurors, this Court considers the following when determining who is credible on a given fact: the witness's opportunity and ability to see or hear or know the things testified to; the witness's memory; the witness's manner while testifying; the witness's interest in the outcome of the case, if any; the witness's bias or prejudice, if any; whether other evidence contradicted the witness's testimony; the reasonableness of the witness's testimony in light of all the evidence; and any other factors that bear on believability. FedCrim–JI9C 1.7 Credibility of Witnesses. In this case, the officers' testimony on their ability to view the marijuana backpacks through the rear window of Defendants' vehicle and their testimony that the vehicle appeared heavily laden is directly contradicted by Defendants' expert witness. Many of the other factors relied upon by the Government are not corroborated by their reports or supported by the other available evidence.

The Government relies on a number of facts to support reasonable suspicion. First, State Route 86 in the area around Pisinemo Village and Sells is a known drug smuggling route. Officer Yazzie provided credible testimony on this fact.

 Second, the officers testify that they saw what appeared to be burlap square backpacks of marijuana. Officer Yazzie testified in great detail about being able to see the square imprint of the burlap. The Court is not convinced that the officers saw anything more than an outline of something in the back of Defendants' vehicle. Officer Yazzie's testimony at the evidentiary hearing about the detail of the burlap sacks is disconcerting to this Court given its lack of corroboration in her police report—in her police report, Officer Yazzie stated only that she saw large burlap backpacks stacked against the rear window of the van.

As the officers testified, it was a dark night with no surrounding light. The only light available was from the officers' vehi-

cle and oncoming traffic. Compelling to the Court are the two photographs listed as Exhibit 6 and Exhibit 15. In a photograph set up by a law enforcement agent with a bright light shining directly through the center of the front windshield, little can be seen from the rear of the vehicle. (*See* Exhibit 6). At most, a person could distinguish a fuzzy outline. Officer Yazzie testified in detail about how she could see the square outline of the backpacks and the square outline was two separate two-foot square objects. Officer Harris also testified that as she looked through the rear window of Defendants' vehicle she also saw large square bundles. There is nothing square or rectangular in the photograph; there are no hard or sharp lines. (*See* Exhibit 6). Further, both officers testified that they could see the brown burlap. Again, the only thing that can be seen in the photograph are two black fuzzy lines.

Further, Exhibit 15 shows the reflective nature of the rear window and the Court is not inclined to believe with a dark tint that allows only ten percent light penetration and an expert testifying that headlights from the rear could not illuminate the detail to see burlap sacks that the officers saw anything more than the fuzzy outline of something in the back of the vehicle. The Court also points out that the Government had an opportunity to show a photograph of what the back of Defendants' vehicle looked like with light illuminating from the rear but no photograph with that evidence was presented.

■ The trier of fact must consider, as part of determining credibility, whether a witness's testimony is contradicted by other witnesses and if the witness's testimony is reasonable in light of all the evidence. *See* FedCrim–JI9C 1.7 Credibility of Witnesses. The officers testimony that they observed square-shaped bundles that appeared to be marijuana is contradicted by

defense's expert witness and it is unreasonable in light of the other evidence presented, as exemplified by the photograph, Exhibit 6.

■ The Court is also not convinced that the vehicle appeared heavily laden. Again, Mr. Bright's testimony is compelling on this point. The maximum gross weight for the rear axle of the vehicle was exceeded by just nineteen pounds assuming that all three of the passengers in the back weighed 300 pounds each. It is extremely unlikely those passengers weighed 300 pounds each as they were described as jumping out of the vehicle, jumping over a fence and fleeing into the desert before Officer Yazzie could pursue them. Thus, the science does not support a theory that the vehicle was heavily laden. Further, the photographs with the marijuana in the vehicle do not show a vehicle that is sagging in the back or weighed down from the marijuana.

The Government argued that Exhibit 5 and Exhibit 18 show that a white line under the vehicle in the impound lot is much more visible when the marijuana is out of the van. The Court does not accept these photographs as reliable evidence. As testified to by Mr. Bright, the photographs are clearly taken at different angles and different distances to the vehicle. Those changes affected what could or could not be seen under the vehicle. Also, the photograph did not include any people in the vehicle. Likewise, the Government had the opportunity to take photographs on a tripod with consistent distance and angle and with a measuring tape on the vehicle to show that the vehicle was closer to the ground with marijuana in it. It did not take those photographs. Further, Exhibit 3 is another photograph of the vehicle with the marijuana in it, which has a clear view of the driver's side rear tire well. (*See* Exhibit 3). Nothing in the photo-

graph suggests the vehicle is weighed down by the marijuana; in fact, the vehicle seems to be sitting well above the tire.

■ The officers also testified that the out-of-are vehicle registration raised their suspicion. The registration was listed for Glendale, Arizona—a suburb of Phoenix. The fact that someone from the Phoenix area would be driving along what was, according to the testimony of the agents, a busy State Route 86 at 12:30 a.m. at night may be somewhat suspicious but not sufficient by itself.

■ There were other factors to which the Court gave little weight. Officer Harris's testimony that there had been a light rain and that drug trafficking increases after a rain because Border Patrol closes its checkpoints was of little value. There is no corroboration that the officers actually relied on this fact to make the stop. If the officers had relied on that fact, it should have been in one of their reports. Likewise, the officers both testified that Defendants' vehicle was traveling at a slow speed. Their reports do not corroborate that this was a critical factor for initiating a stop. Further even if Defendants were traveling 10 to 15 miles below the speed limit on a busy two lane highway in the middle of a dark night, the Court is not convinced that this carries much suspicion. Finally, the fact that both officers testified to following Defendants for four miles between milepost 106 and milepost 102 is also of little consequence. As the officers testified, traffic was heavy that night and the officers were traveling back to their office. They approached Defendants' vehicle and waited for a break in oncoming traffic to pass. Instead of passing the vehicle, they then followed Defendants for a while and then initiated a stop. All of this while traveling above 50 miles per hour. It seems likely they would have traveled four miles. There was no testimony that the way Defendants' vehicle drove during this distance was suspicious or that the distance driven was suspicious.

The final factor relied upon by the Government is the exit of the three individuals from Defendants' vehicle while it was alleging still moving "very slowly". This is not a factor that should be considered in ascertaining reasonable suspicion under the facts of this case.

■ Reasonable suspicion necessary for the stop of a vehicle can be based on events that occur during a chase by border patrol officers once an officer has initiated a stop of the vehicle. *United States v. Santamaria–Hernandez,* 968 F.2d 980 (9th Cir.1992). In *Santamaria,* after the Border Patrol officer initiated the stop, the driver of defendants' vehicle accelerated from 50–55 mph up to 70–80 mph and three heads of people hiding in the vehicle popped up in the back seat of the vehicle. *Id.,* 968 F.2d at 982. The District Court in that case found reasonable suspicion lacking because such suspicion was not developed prior to the officer initiating a stop of the vehicle. The Ninth Circuit reversed the District Court, holding that reasonable suspicion could be developed until an actual seizure of the vehicle occurred, which would not happen until the vehicle yielded to the officer initiating the stop. *Id.* Thus, the actions of the driver in accelerating and failing to yield to the officer initiating the stop gave the officer sufficient reasonable suspicion to stop the vehicle. *Id.* at 982–983.

The Ninth Circuit based its decision on the Supreme Court's reasoning in *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). In *Hodari,* the defendant who was fleeing from law enforcement when he tossed away a rock of cocaine was not "seized" in terms of the Fourth Amendment until law enforcement tackled and handcuffed him. Thus, the rock cocaine that defendant tossed away

when he was fleeing from law enforcement was not suppressed because defendant had not yet been seized and the Fourth Amendment did not apply. *Id.* at 626, 111 S.Ct. 1547. The Supreme Court ruled that a seizure does not occur if, in response to a show of authority, the subject does not yield; in that event, the seizure occurs only when the police physically subdue the subject. *Id.*

■ In *Santamaria,* the Ninth Circuit analogized a defendant fleeing on foot to a defendant fleeing in his car. A defendant fleeing in his vehicle is the same as a defendant fleeing on foot and is therefore not "seized" for Fourth Amendment purposes until he is physically apprehended by law enforcement ·at the end of a chase. "The determination whether officers have founded suspicion to justify a stop may take into account all of the events that occur up to the time of physical apprehension of a suspect who flees." *Santamaria,* 968 F.2d at 983.

■ The case before this Court is distinguishable from *Santamaria.* Defendants did yield in response to a show of authority from the officers. Both officers testified that when Officer Harris initiated her red and blue emergency lights, Defendants slowed their vehicle and began moving it to the side of the road. The fact that three of the passengers in Defendants' vehicle fled is not of consequence to whether these two Defendants, and in particular the driver of the vehicle, yielded. All evidence shows Defendants yielded by immediately slowing their vehicle and stopping within a reasonable amount of time.

Thus, the Government is left with little in the way of reasonable suspicion to stop Defendants' vehicle. At best, the officers observed a fuzzy outline of something in the back of Defendants' vehicle while Defendants were driving on a road known for drug smuggling in a vehicle registered to someone in Phoenix. Defendants have met their burden of showing the officers did not have the requisite reasonable suspicion to stop their vehicle.

### Recommendation

For the reasons outlined above, the Magistrate Judge recommends that the District Judge after her independent review, GRANT the Motion to Suppress. (Doc. 26).

Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections within fourteen days of being served with a copy of the Report and Recommendation. If objections are not timely filed, they may be deemed waived. The parties are advised that any objections filed are to be identified with the following case number: **CR–10–463–TUC–CKJ.** .